THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA     :
     :    CRIMINAL ACTION
v.     :    NO. 3:14-cr-00022-TCB-RGV
     :
THOMAS D. MELVIN, *et al.*,     :

## MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION, AND ORDER

Defendants Thomas D. Melvin ("Melvin"), C. Roan Berry ("Berry"), Michael S. Cain ("Cain"), and Joel C. Jinks ("Jinks"), collectively referred to as "defendants," are charged in a seven-count indictment with securities fraud, in violation of 18 U.S.C. §§ 1348 and 2. [Doc. 1].[1] Before the Court are motions to dismiss the indictment for being founded on an unconstitutionally vague statute filed by Jinks and Melvin, [Docs. 48 & 51], which the government opposes in a consolidated response, [Doc. 74], and motions to supplement his motion to dismiss and to dismiss Count One of the indictment filed by Melvin, [Docs. 71 & 83],[2] which the government opposes in another consolidated response, [Doc. 93]. Jinks and Berry

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Melvin's motion to supplement his motion to dismiss the indictment, [Doc. 83], which was docketed as a supplemental brief rather than a motion, is hereby **GRANTED**, and the Court will consider those arguments in ruling on the pending motions.

have also filed separate motions to dismiss the indictment for failure to allege a crime, [Docs. 46 & 57], which the government opposes in a consolidated response, [Doc. 73]. Finally, Melvin has filed several motions to dismiss the indictment and to suppress evidence, [Docs. 75, 80, 82, 84, & 86], all of which the government opposes, [Docs. 94, 95, 96, & 97].[3]   For the reasons that follow, it is **RECOMMENDED** that the pending motions, [Docs. 46, 48, 51, 57, 71, 75, 80, 82, 84, & 86], be **DENIED**.

## I.  INTRODUCTION

On December 2, 2014, a grand jury returned an indictment against defendants, charging seven counts of securities fraud, in violation of 18 U.S.C. §§ 1348 and 2. [Doc. 1].  According to the indictment, Melvin was a "certified public accountant licensed in Georgia and [a] partner in the accounting firm Melvin, Rooks, & Howell ('MRH') in Griffin, Georgia."  [Id. at 2-3 ¶ 2d].  As an accountant, Melvin "regularly received confidential information from clients," and he was prohibited by the Georgia State Board of Accountancy from disclosing confidential information obtained in the course of performing professional services without client consent.

---

[3] Melvin has also filed a motion to adopt, [Doc. 72], Jinks' motions to dismiss, [Docs. 46 & 48], and Berry has moved to adopt, [Doc. 87], Melvin's motion to dismiss the indictment on grounds of collateral estoppel, [Doc. 86].  For good cause shown, Melvin and Berry's motions to adopt, [Docs. 72 & 87], are hereby **GRANTED**.

[Id. at 3 ¶ 2d].  Defendants Berry, Cain, and Jinks, all of whom lived or worked in

Griffin, Georgia, were clients of Melvin.[4]  [Id. at 3-4 ¶¶ 2h-2k].

Chattem, Inc. ("Chattem"), an "over-the-counter pharmaceutical

manufacturer headquartered in Chattanooga, Tennessee," was a "public company

whose stock traded on the NASDAQ Stock Market" and whose "securities were

registered with the United States Securities and Exchange Commission ('SEC')

pursuant to Section 12(b) of the Exchange Act[.]"  [Id. at 2 ¶ 2a].  Sanofi-Aventis

("Sanofi"), a French pharmaceutical company that manufactured and marketed

prescription and over-the-counter medication, traded American depository shares

on the New York Stock Exchange.  [Id. at 2 ¶ 2b].  In late 2009, Chattem engaged in

discussions with Sanofi regarding Sanofi's potential acquisition of Chattem.  [Id. at

---

[4] The indictment alleges that Berry lived in Griffin, Georgia, and owned a
small business and that Melvin served as Berry's accountant for both personal tax
services and accounting services for his business.  [Doc. 1 at 3-4 ¶ 2i]; but see [Docs.
53 at 1 n.1 & 76 at 7 n.2 (Berry's counsel noting that Berry's business was incorrectly
named in the indictment and that Berry actually lived in Jackson, Georgia)].  Berry
and Melvin also maintained a close personal friendship.  [Doc. 1 at 4 ¶ 2i].
Additionally, defendant Cain lived in Griffin, Georgia, and was senior vice
president and securities broker at Morgan Stanley Smith Barney ("Morgan Stanley"),
who "traded securities on behalf of clients and on his own behalf."  [Id. at 4 ¶ 2j].
Melvin served as Cain's accountant for personal tax services, Cain managed MRH's
retirement accounts, and Cain and Melvin referred clients to each other.  [Id.].
Defendant Jinks lived in Griffin, Georgia, and owned a small business, and Melvin
served as his accountant for both personal tax services and for his business.  [Id. at
4 ¶ 2k].  Jinks and Melvin also maintained a close personal friendship.  [Id.].  The
indictment also refers to Person A, who worked with Melvin at MRH.  [Id. at 4 ¶ 2l].

2 ¶ 2c].  In November, 2009, Chattem held a series of confidential board of directors meetings in which Sanofi's proposed acquisition of Chattem at a price of above $90 per share was discussed, and eventually, Chattem agreed to proceed with due diligence, but Chattem's directors had an obligation to maintain the confidentiality of the information received in connection with their positions on the board.  [Id.].

One of Chattem's board members, who was present during the November, 2009, board meetings discussing Sanofi's proposed acquisition, was a client of defendant Melvin.  [Id. at 3 ¶ 2e].  On December 4, 2009, this board member met with Melvin for personal tax advice based on the proposed acquisition of Chattem, and he advised Melvin that the information he had just provided him, including the approximate timing of the merger and potential acquisition price, was confidential. [Id. at 3 ¶ 2f].  On this same day, Melvin called Berry, Cain, and Jinks, all within an hour of each other, and following these initial conversations, Berry, Cain, and Jinks each purchased Chattem stock.  [Id. at 6 ¶ 7].[5]  In addition, on December 7, 2009,

---

[5] Specifically, the indictment charges that Cain, aided and abetted by Melvin, first bought Chattem stock on December 4, 2009, and that again aided and abetted by Melvin, he purchased additional shares on December 7, December 11, and December 15, 2009.  [Doc. 1 at 6-7 ¶ 9].  Additionally, Melvin caused the purchase of Chattem stock for or on behalf of Person A on December 10, 2009, and Berry, aided and abetted by Melvin, purchased Chattem stock on December 7, 2009, and Jinks, also aided and abetted by Melvin, purchased Chattem shares on December 11, 2009.  [Id.].  These purchases of Chattem stock by Berry, Cain, and Jinks, as well as the purchase of shares on behalf of Person A, form the seven counts of securities fraud alleged in the indictment.  [Id. at 6-8 ¶ 9].

Melvin advised Person A that a client had provided him "Inside Information about the potential acquisition of Chattem, including that the merger would occur before the end of 2009 and that Chattem's stock would rise approximately $20-25 per share," and Person A then had his father-in-law purchase Chattem stock for him, or on his behalf.  [Id. at 6 ¶ 8].

On December 21, 2009, Sanofi publicly announced that it was acquiring Chattem, and Chattem's stock rose from $69.98 per share at closing on December 20, 2009, to $93.50 per share at closing the next day.  [Id. at 3 ¶ 2g].  From December 4, 2009, through December 21, 2009, Melvin exchanged multiple calls with Berry, Cain, and Jinks.  [Id. at 6 ¶ 7].  Berry, Cain, Jinks, and Person A sold their Chattem shares soon after the merger was publicly announced on December 21.  [Id. at 5-6 ¶ 6].

According to the indictment, from December 4, 2009, through January 14, 2010, defendants Melvin, Berry, Cain, and Jinks, as well as unindicted Person A, "aided and abetted by each other, did knowingly and willfully execute and attempt to execute a scheme and artifice (1) to defraud other persons in connection with stock securities of Chattem, Inc. and (2) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of stock securities of Chattem . . . ."  [Id. at 1 ¶ 1].[6]  With

---

[6] On April 7, 2015, the Court granted, in part, defendants' motions for a bill of particulars and ordered the government to file and serve a bill of particulars

regard to the scheme to defraud, the indictment sets forth that Melvin

"misappropriated material, nonpublic information . . . regarding Sanofi's planned

acquisition of Chattem in advance of the public merger announcement," in violation

of the "duties of trust and confidence that licensed accountants owe to clients under

the Georgia State Board of Accountancy Code of Professional Conduct," the

"expectations of confidentiality held by his client," and "his client's express request

that the Inside Information shared with Melvin remain confidential," and that he

disclosed this information to Berry, Cain, Jinks, and Person A "for his own personal

benefit" and "with the understanding that the Inside Information would be used for

the purpose of purchasing or selling securities."  [Id. at 5 ¶¶ 3-4].

---

detailing the aiding and abetting allegations set forth in paragraphs 1 and 9 of the
indictment, including the identity of each person known to the government who is
alleged to have aided and abetted each of the defendants identified in Column B of
paragraph 9. [Doc. 98]. On April 28, 2015, the government filed a bill of particulars,
explaining that Melvin "aided and abetted each of Defendants Cain, Berry, Jinks,
and Person A . . . by misappropriating and disclosing the information regarding
Chattem's impending acquisition and disclosing it to each of them with the
understanding that the inside information would be used for the purpose of stock
trading." [Doc. 114 at 2].  The government also stated that there is "no other person
known to the [g]overnment who is alleged to have aided and abetted each of the
[d]efendants identified in Column B of Paragraph 9." [Id.].  Cain objects to the bill
of particulars filed by the government, contending that it "does not comply with the
details required by the Court's Order." [Doc. 115 at 4].  However, Cain's objection
is without merit, as the Court finds that the government has complied with the April
7 Order by specifying that Melvin alone aided and abetted each co-defendant and
Person A.

The indictment further sets forth that Berry, Cain, Jinks, and Person A, "aided and abetted" by Melvin, "carried out the scheme and artifice to defraud by misappropriating Inside Information of Chattem's, knowing that it had been disclosed by Melvin . . . so that [they] could execute and cause the execution of securities transactions on the basis of the Inside Information." [Id. at 5 ¶ 5]. Finally, the indictment alleges that Berry, Cain, Jinks, and Person A "in turn executed and caused to execute transactions in Chattem's securities on the basis of the Inside Information provided by [Melvin] for their own benefit through personal online brokerage accounts," and that they "sold their Chattem shares after the merger was publicly announced, thereby earning illegal profits." [Id. at 5-6 ¶ 6]. Defendants have now filed several motions in relation to the instant indictment, see [Docs. 46, 48, 51, 57, 71, 75, 80, 82, 84, & 86], and after having been fully briefed, the pending motions are now ripe for ruling.[7]

_____

[7] On August 28, 2012, the SEC initiated a civil action against Melvin, Cain, Jinks, and Peter C. Doffing, based on the alleged insider trading scheme involving Chattem. See SEC v. Melvin, Civil Action No. 1:12-cv-02984-CAP, at [Doc. 1] (N.D. Ga. Aug. 28, 2012) (the "SEC civil action"). As part of its investigation prior to filing the civil action, the SEC issued a series of investigative subpoenas and deposed Melvin on January 6, 2012. See [Doc. 94-1]. On August 14, 2013, the district court entered a final judgment against Melvin pursuant to a proposed consent order, in which Melvin agreed to a civil settlement with the SEC, obligating him to pay $61,831.95 as disgorgement of profits, plus $6,994.59 in prejudgment interest and a civil penalty of $108,930.05, for a total of $177,756.59, see SEC civil action, at [Doc. 51] (N.D. Ga. Aug. 14, 2013), and on January 13, 2014, the SEC civil action against the remaining defendants was administratively closed, pending the resolution of the

## II.  DISCUSSION

**A.**    **Motions to Dismiss the Indictment as Founded on an Unconstitutionally Vague Statute, [Docs. 48 & 51]**

Defendants are charged with securities fraud, in violation of 18 U.S.C. § 1348,

which provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
>
>> (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)); or
>>
>> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d));
>
> shall be fined under this title, or imprisoned not more than 25 years, or both.

instant criminal case, see id., at [Doc. 135] (N.G. Ga. Jan. 13, 2015).  Additionally, an SEC administrative proceeding was instituted against Melvin, and on September 22, 2014, Chief Administrative Law Judge Brenda P. Murray ("ALJ Murray"), concluded that Melvin should be permanently disqualified from the practice of accounting before the SEC, see [Doc. 84 at 4-5; Doc. 97-1], and Melvin has sought to have that decision set aside, see [Doc. 75 at 4; Doc. 110-5].

18 U.S.C. § 1348(1)-(2).

Jinks moves to dismiss the indictment, arguing that § 1348 is "unconstitutionally void for vagueness in that it fails to charge an offense, fails to give notice to citizens as what is illegal, and encourages arbitrary and discriminatory enforcement, in violation of [his] right to due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution[.]" [Doc. 48 at 1]. In particular, Jinks asserts that the phrase "in connection with" is "void for vagueness" in that "[i]t fails to indicate what degree of connection must be made 'with any commodity . . . or any option . . . or any security' or 'with the purchase or sale of any commodity,' etc., for the conduct to fall within the statute." [Id. at 5 (second and third alterations in original)]. Melvin has also filed a motion to dismiss based on the same grounds, and he similarly asserts that the "spare [sic] words contained in 18 U.S.C. 1348 provide no clue to the public or the courts as to what conduct is prohibited under the statute," and that "[i]t also fails to give defendants . . . notice as to the specific conduct that would result in a violation of Section 1348." [Doc. 51 at 7]. He further contends that § 1348 is "impermissibly vague because it gives prosecutors unlimited discretion to determine what suspicious conduct they will pursue." [Id. at 8].

"'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'" <u>Allied Veterans of World, Inc.: Affiliate 67 v. Seminole Cnty., Fla.</u>, 783 F. Supp. 2d 1197, 1206 (M.D. Fla. 2011) (<u>quoting</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972)). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." <u>Hill v. Colorado</u>, 530 U.S. 703, 732 (2000) (citation omitted); <u>accord</u> <u>United States v. Williams</u>, 553 U.S. 285, 304 (2008). However, "[t]here is a strong presumption that statutes passed by Congress are valid," <u>United States v. Carver</u>, 422 F. App'x 796, 800 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted), and "because [d]efendants' void for vagueness challenge does not raise a First Amendment issue, it must be evaluated only as applied, in the light of the facts of the case at hand," <u>United States v. Maughon</u>, Criminal Action No. 1:11–CR–028–TWT–ECS, 2011 WL 3489973, at *3 (N.D. Ga. June 21, 2011), adopted by 2011 WL 3489948, at *1 (N.D. Ga. Aug. 9, 2011) (citations omitted). Furthermore, "[t]he constitutionality of an allegedly vague statutory standard is closely related to whether the standard incorporates a requirement of *mens rea*," and the Supreme Court has stated:

10

> A statutory requirement that an act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain.  But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware. . . .

Id. (quoting Screws v. United States, 325 U.S. 91, 101-102 (1945) (Douglas, J. concurring)).  "Supreme Court precedent makes clear that courts should use the void for vagueness remedy sparingly," as "under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws[.]"  United States v. Gerlay, No. 3:09–cr–00085–JWS–JDR, 2009 WL 4897748, at *1 (D. Alaska Dec. 11, 2009) (footnote and internal marks omitted).[8]

Under § 1348, it is unlawful to knowingly execute, or attempt to execute, a scheme or artifice "to defraud any person in connection with any commodity for future delivery" or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery[.]"  18 U.S.C. § 1348(1)-(2). Section 1348 "is the securities-fraud statute" and it is "guided by cases interpreting

---

[8] Indeed, "[a] court may not invalidate application of a statute under the void-for-vagueness doctrine simply because there is some degree of ambiguity in the provisions of the statute," United States v. Ortiz, 738 F. Supp. 1394, 1397 (S.D. Fla. 1990), and the Supreme Court "has rarely held federal statutes to be void for vagueness," KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner, 647 F. Supp. 2d 857, 893 (N.D. Ohio 2009) (citation omitted).

the mail and wire fraud statutes." United States v. Brooks, No. 06–CR–550 (S–1)(JS), 2009 WL 3644122, at *4 n.5 (E.D.N.Y. Oct. 27, 2009) (citations omitted).

As the government points out, there is a dearth of case law addressing § 1348, see [Doc. 74 at 7], but the Court finds persuasive the reasoning in United States v. Motz, 652 F. Supp. 2d 284, 294-95 (E.D.N.Y. 2009), where the court rejected a vagueness challenge to § 1348, finding that the defendant had "failed to show that the language of 18 U.S.C. 1348 is so vague as to create[] a trap for the unwary and permit[] arbitrary enforcement," and that the "statute's language [was] intentionally broad because Congress sought to create a mechanism by which prosecutors could combat the myriad of ever-evolving securities fraud schemes." 652 F. Supp. 2d at 295 (omissions in original) (citation and internal marks omitted); see also United States v. Coscia, Case No. 14 CR 551, 2015 WL 1805955, at *5 (N.D. Ill. Apr. 16, 2015) (citation omitted). Indeed, the Motz court noted that the "requisite elements of the statute are straightforward," providing that the government "must show: (1) fraudulent intent[;] (2) a scheme or artifice to defraud; and (3) a nexus with a security," and that "this standard [was] sufficiently clear to prevent the arbitrary or discriminatory application of 18 U.S.C. 1348." 652 F. Supp. 2d at 295 (citation and internal marks omitted).

Jinks argues that the phrase "in connection with" in both subsections of § 1348 is vague since it is "easily subject to varying degrees of subjective opinions and interpretations." [Doc. 48 at 5]. In particular, he likens it to the phrase "or otherwise involves conduct that presents a serious potential risk of physical injury to another," as used in the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2), see [id.], which is being challenged on vagueness grounds in a case pending before the Supreme Court, see Johnson v. United States, 135 S. Ct. 939 (2015). However, Jinks' argument comparing this phrase in the ACCA to the use of "in connection with" in § 1348 is unpersuasive.

"When interpreting a statute, the starting point . . . is the language of the statute itself." United States v. Zuniga-Arteaga, 681 F.3d 1220, 1223 (11th Cir. 2012) (alteration in original) (citation and internal marks omitted). Courts "analyze the language of the provision at issue, the specific context in which that language is used, and the broader context of the statute as a whole," and "[i]f this analysis reveals that the provision has a plain and unambiguous meaning with regard to the particular dispute in the case and the statutory scheme is coherent and consistent, then [the] inquiry is complete." Id. (citations and internal marks omitted). "An undefined word or phrase does not necessarily render an enactment vague," and courts "may ascertain an undefined term's meaning by reading it in context, or by

13

looking to the term's common meaning." KindHearts for Charitable Humanitarian Dev., Inc., 647 F. Supp. 2d at 893 (citations omitted). "Courts may look to other statutes and case law to determine an undefined term's meaning," but "a statute may be facially vague if it contains language that lends itself to subjective interpretation." Id. at 894 (citations and internal marks omitted).

While Jinks maintains that the phrase "in connection with" is unconstitutionally vague, as the government points out, courts have found that same phrase, when used in other criminal statutes, not to be vague when the words are given their ordinary meaning. See [Doc. 74 at 11 (citing United States v. Wetherald, 636 F.3d 1315, 1326-27 (11th Cir. 2011); United States v. McEvoy, 820 F.2d 1170, 1172-73 (11th Cir. 1987) (per curiam))]; see also United States v. Rhind, 289 F.3d 690, 695 (11th Cir. 2002). "The words 'in connection with' ordinarily mean associated with, related to, or the like," Trice, Geary & Myers, LLC v. CAMICO Mut. Ins. Co., Civil No. WDQ–09–2754, 2010 WL 1375389, at *5 (D. Md. Mar. 25, 2010), reversed on other grounds by, 459 F. App'x 266 (4th Cir. 2011) (unpublished), and the "Supreme Court does not employ a technical legal analysis to make this determination; it follows common sense logic" that the "likelihood that anyone would not understand any of those common words seems quite remote," McClanahan v. City of Tumwater, No. 11–cv–5623 RBL, 2012 WL 748299, at *5 (W.D.

Wash. Mar. 6, 2012) (internal marks omitted) (quoting Hill, 530 U.S. at 732). Indeed, the concern Justice Scalia has expressed regarding the phrase, "a serious potential risk of physical injury to another," used in the residual clause of the ACCA is that it leaves up in the air "how much risk of physical injury each crime presents," lending itself to subjective interpretation, see James v. United States, 550 U.S. 192, 227-28 (2007) (Scalia, J., dissenting), whereas here, the phrase "in connection with" is quite different from terms that are "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings," United States v. Wilson, Criminal Action No. 12–00293–KD–N, 2013 WL 1296694, at *1 (S.D. Ala. Mar. 26, 2013) (citation and internal marks omitted).

Similarly, Melvin argues that the phrase "scheme or artifice to defraud" provides no direction as to what conduct is prohibited under the statute. [Doc. 51 at 7]. In particular, he argues that unlike "the mail and wire fraud statutes . . . which specifically define how they are breached – by transmitting fraudulent representations over wire, radio or television in order to obtain money or property – Section 1348(1) provides no such direction." [Id.]. He also argues that "scheme or artifice to defraud" as used in both the mail and wire fraud statutes, which "includes a scheme or artifice to deprive another of the intangible right of honest services," is inapplicable here since the Supreme Court "limited the scope of 'honest-services

fraud' only to fraud schemes of bribery and kickbacks," neither of which is charged in the instant indictment, and that "this term does not have a generally accepted meaning that can provide guidance as to how it should be interpreted in the context of securities transactions."   [Id. at 7-8 (citation and internal marks omitted)]. However, "[r]ather than demonstrating that the language scheme [or artifice] to defraud does not describe a comprehensible standard, as [Melvin] suggests, [courts have made] clear that the terms that [Melvin] considers too vague have well-established meaning and significance in our jurisprudence."   United States v. Whitty, 688 F. Supp. 48, 54-55 (D. Me. 1988) (citations and internal marks omitted).

"Thus, if a federal statute can constitutionally be applied to a particular defendant's case, a court is obliged to construe the law to cover at least that circumstance," United States v. Rybicki, 354 F.3d 124, 149 (2d Cir. 2003) (citation omitted), and in the Court's view, "the statute is clearly not void for vagueness as applied to the alleged activities of [] [d]efendant[s]," Ortiz, 738 F. Supp. at 1398.  The indictment alleges that Melvin's client, a Chattem board member, shared confidential information with Melvin about Chattem's pending merger in confidence and for the purpose of obtaining tax advice and that Melvin understood that this insider information was shared in confidence.  See [Doc. 1 at 3 ¶ 2f].  The indictment then alleges that Melvin, while owing a duty of trust and confidence to

16

his client, misappropriated and used the nonpublic information to aid and abet others, including his partner, Person A, to trade in Chattem securities for their benefit, as well as for his own personal benefit.  [Id. at 3 ¶ 2d, 5-6 ¶¶ 3-6, 6-7 ¶¶ 8-9]. Despite Jinks and Melvin's arguments to the contrary, see generally [Docs. 48, 51, & 90], "the Court declines to conclude, based solely on the scarcity of cases interpreting § 1348, that the statute fails to provide a person of ordinary intelligence fair notice of the conduct that it prohibits," Coscia, 2015 WL 1805955, at *6 (citation and internal marks omitted).

In addition, although Melvin asserts that § 1348 "permit[s] prosecutors unfettered discretion in charging conduct," [Doc. 51 at 9], the "Constitution does not ban all discretion on the part of police officers and prosecutors as effective law enforcement often requires the exercise of some degree of [] judgment," and a "statute will survive an as-applied vagueness challenge based on the second prong if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude the law enforcement officers and factfinders might have in other, hypothetical applications of the statute."  United States v. Smith, 985 F. Supp. 2d 547, 589 (S.D.N.Y. 2014) (emphasis, citations, and internal marks omitted).  Indeed, "[l]aws must provide ascertainable standards of guilt to prevent arbitrary, erratic and discriminatory

enforcement," <u>Owens v. Wainwright</u>, 698 F.2d 1111, 1115 (11th Cir. 1983) (per curiam) (citations omitted), and contrary to Melvin's contentions, § 1348 simply does not allow prosecutors "to charge 'securities fraud' based upon any sort of act or service," [Doc. 51 at 8], but requires the government to prove either that defendants had a scheme of artifice to defraud, with a nexus to a security, and fraudulent intent under § 1348(1), or a scheme or artifice to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property, with a nexus to the purchase or sale of any security, while possessing fraudulent intent under § 1348(2), <u>United States v. Hatfield</u>, 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010); 18 U.S.C. § 1348(1)-(2), standards which the <u>Motz</u> court found were "sufficiently clear to prevent [] arbitrary or discriminatory application," <u>Motz</u>, 652 F. Supp. 2d at 295.[9]

---

[9] Melvin also devotes several pages of his motion, <u>see</u> [Doc. 51 at 9-15], to arguing that since the government could not prove its case under Section 10(b) of the Securities Exchange Act, it "turned to the securities fraud charges under 18 U.S.C. § 1348" in the hopes of avoiding or eliminating "several of the important safeguards that have developed over the last 20 years," [<u>id.</u> at 11], and that "Due Process requires that the safeguards built into Section 10(b) and Rule 10b-5 insider trading jurisprudence be carried over into cases brought under § 1348," [<u>id.</u> at 15]. The Court, however, fails to see how the government's decision to indict defendants under § 1348, rather than under the Securities Exchange Act, somehow renders § 1348 unconstitutionally vague. Furthermore, "[t]he court will judge the sufficiency of the security fraud allegations based on the elements of the charged offenses and relevant case law," <u>United States v. Slawson</u>, Criminal Case No. 1:14–CR–00186–RWS–JFK, 2014 WL 5804191, at *6 (N.D. Ga. Nov. 7, 2014), adopted by 2014 WL 6990307, at *1 (N.D. Ga. Dec. 10, 2014), and not on other offenses that the government has not charged. Moreover, the Court agrees with the government that Melvin's reliance on <u>United States v. Radley</u>, 632 F.3d 177 (5th Cir. 2011), is

Accordingly, Jinks and Melvin's motions to dismiss the indictment for unconstitutional vagueness, [Docs. 48 & 51], are due to be denied.

**B.    Motions to Dismiss the Indictment for Failure to allege a Crime, [Docs. 46, 57, & 71]**

Jinks moves to dismiss the indictment for failure to allege essential elements of the crimes charged, [Doc. 46], which Melvin has moved to adopt, [Doc. 72].[10] Similarly, Berry moves to dismiss the indictment for failure to allege a crime, [Doc. 57], and the government has filed a consolidated response in opposition to Jinks and Berry's motions to dismiss, [Doc. 73].  Melvin has also filed a motion to dismiss Count One of the indictment, see [Doc. 71], arguing that despite its attempt "to identify acts constituting a violation of § 1348, it has failed to negate the existence of facts and circumstances known to the government under which [his] disclosure of the alleged inside information to Person A may well have been a lawful act" since "it could well be normal business practice that Melvin and Person A, two partners at MRH, routinely exchanged in presumably privileged inter-office discussion, confidential information provided by clients for the purposes of receiving

---

misplaced because there is no statutory exemption in § 1348 comparable to the exemption in the Commodities Exchange Act at issue in Radley.

[10] Jinks also moves in limine for the Court to direct the government to proffer its evidence concerning his knowledge of the "insider's receipt of a personal benefit in exchange for disclosing the material, nonpublic information" and to produce the Grand Jury minutes for inspection.  [Doc. 46 at 14-15].

accounting services," [id. at 10-11]. Melvin also contends that Count One should be dismissed for failure to charge an offense under § 1348 since Count One fails to allege any specific intent to deceive, to cheat anyone, or a scheme to defraud anyone, nor does it "articulate any legally cognizable personal benefit that rises to the level of 'property' as required by § 1348(2)." [Id. at 11-19 (emphasis omitted)]. The government has filed a response in opposition to Melvin's motion. [Doc. 93].

### 1.  *Failure to Allege a Crime*

Jinks contends that the indictment should be dismissed for failure to allege essential elements of the crimes charged since it "never alleges that [he] had the requisite knowledge that the inside information had been disclosed in exchange for a personal benefit or gain, and, according to the indictment, the insider did not have a personal benefit or gain in exchange for his disclosure." [Doc. 46 at 2].[11] Berry maintains that the indictment should be dismissed because it fails to allege that Melvin either received a personal benefit from the disclosure of non-public information, or that he was aware of any personal benefit that Melvin received from

---

[11] In this respect, Jinks asserts that the Chattem board member was the "corporate insider" and that the indictment is insufficient because it fails to allege that Jinks knew that the Chattem board member had disclosed the inside information for a personal benefit or gain, or that he had breached his duty of confidentiality. [Doc. 46 at 3]. However, for purposes of resolving these motions, it is not necessary to decide whether the Chattem board member should be considered the "insider" and whether Jinks knew of the board member's receipt of a personal benefit or gain or breach of his duty of confidentiality.

making the disclosure. [Doc. 57].[12]  In making their arguments, both Jinks and Berry contend that insider trading jurisprudence under Rule 10b-5 applies even though the indictment only charges violations of § 1348. [Doc. 46 at 4-5; Doc. 57 at 10].

"'An indictment is valid if it contains the elements of the offense intended to be charged.'"  United States v. Honeycutt, Criminal Action No. 2:12–CR–00022–RWS, 2014 WL 2003029, at *4 (N.D. Ga. May 14, 2014), adopted at *1 (quoting United States v. Williams, 181 F. App'x 945, 949 (11th Cir. 2006) (per curiam) (unpublished)).  "An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense."[13]  United States v. Aydin, Criminal Case No.

---

[12] Likewise, Melvin moves to dismiss Count One of the indictment, arguing that it "does not articulate any legally cognizable personal benefit that rises to the level of 'property' as required by § 1348(2)," [Doc. 71 at 19 (emphasis omitted)], and he also asserts that "Count One contains no allegations indicating the existence of fraudulent intent" necessary to establish a violation of § 1348(1), [id. at 15].

[13] "[I]f the indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." Slawson, 2014 WL 5804191, at *5 (citations and internal marks omitted). And, "[i]n judging the sufficiency of an indictment, courts are cautioned to use a broad and enlightened standpoint of common sense and right reason rather than [a] narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." Id. (second alteration in original) (citation and internal

1:12–CR–221–2–ODE–AJB, 2015 WL 927666, at *7 (N.D. Ga. Mar. 3, 2015), adopted at *5 (citations and internal marks omitted); see also Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"). "'In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment, and more specifically, the language used to charge the crimes.'" Honeycutt, 2014 WL 2003029, at *4 (emphasis omitted) (quoting United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006)); see also United States v. Kopp, Criminal Action No. 1:12–CR–0269–RWS, 2014 WL 2154199, at *4 (N.D. Ga. May 21, 2014), adopted at *1 (alteration in original) (citation and internal marks omitted) ("It is well-settled that a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial").

In resolving the pending motions to dismiss based on failure to allege a crime, the Court finds that the arguments advanced in this case are substantially similar to those made in Slawson, and the decision in that case denying an analogous motion to dismiss is well-reasoned and persuasive. In Slawson, the defendant was charged with securities fraud under § 1348, among other alleged violations, based on his trading in a company's securities following his receipt of insider information, and

marks omitted).

he moved to dismiss the indictment, arguing that the indictment failed to allege that he, "who was at least once if not more removed from the insiders providing the non-public information, knew the insiders, knew that the insiders breached their duty by making the disclosures, and knew that the insiders received a benefit for their actions."  2014 WL 5804191, at *1-2, 4 (citation omitted).  The defendant relied on "Section 10(b) and Rule 10b-5 and 15 U.S.C. § 78ff(a) and cases discussing those statutes and regulations in support of his claim that the indictment fail[ed] to allege an essential element of 'insider tipper trading[.]'"  Id. at *4.[14]

In addressing the defendant's motion to dismiss, the Honorable Janet F. King, United States Magistrate Judge, first rejected the application of Section 10(b), Rule 10b-5, and 15 U.S.C. §§ 78ff and 78j(b), as well as the case law interpreting those statutes and regulations, noting that the court would "judge the sufficiency of the security fraud allegations based on the elements of the charged offenses and relevant case law."  Id. at *6.  Judge King then explained that § 1348 "makes it a crime either to knowingly execute a scheme to defraud a person in connection with the sale of a security or to knowingly execute a scheme to obtain, by means of false pretenses,

---

[14] In particular, the defendant in Slawson, much like the defendants here, asserted that "in order to allege a violation of 'tippee insider trading,' the indictment must allege that the tippee, that is, [the] [d]efendant [], was personally aware of the insider's self-dealing and the benefit the insider received because of his actions." Slawson, 2014 WL 5804191, at *4 (citation omitted).

money or property in the connection with the sale of a security," id. (citations and internal marks omitted), and "[a]bsolutely nothing in the language of § 1348 or any case this court found setting forth the elements for either subsection of that statute makes reference to proving, much less alleging, that a defendant, who as part of the scheme to defraud or to obtain money or property by false and fraudulent pretenses, knew the identities of individuals providing material, non-public information, knew that these individuals breached their duty by making the disclosures, and knew that these individuals received a benefit for their actions," id.; see also Hatfield, 724 F. Supp. 2d at 324 (noting that the government must prove either that defendants had a scheme of artifice to defraud, with a nexus to a security, and fraudulent intent under § 1348(1), or a scheme or artifice to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property, with a nexus to the purchase or sale of any security, while possessing fraudulent intent under § 1348(2)). The Court agrees, and despite Jinks and Berry's attempts to incorporate elements of insider trading applicable to Section 10(b) and Rule 10b-5, [Doc. 46 at 4-5; Doc. 57 at 10, 13-14, 16], the Court "declines to impose on the charges set forth in the indictment the requirement to plead elements of offenses not charged in the indictment," Slawson, 2014 WL 5804191, at *7.[15]

---

[15] For this reason, the Court finds that Jinks, Berry, and Melvin's reliance on United States v. Newman, 773 F.3d 438, 452 (2d Cir. 2014), see [Doc. 46 at 8; Doc. 57

The indictment alleges that defendants, aided and abetted by Melvin who misappropriated non-public information disclosed by a Chattem board member for his own personal benefit, knowingly and willfully executed and attempted to execute a scheme and artifice (1) to defraud other persons in connection with stock securities of Chattem, and (2) to obtain, by false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of Chattem stock securities.[16]  See [Doc. 1].  The indictment also alleges that

---

at 5-14; Doc. 71 at 23-27], which involved securities fraud charges brought under sections 10(b) and 32 of the Securities Exchange Act of 1934 and SEC Rules 10b-5 and 10b5-2, among other violations not relevant here, is misplaced.

[16] Melvin moves to dismiss Count One of the indictment, which relates to the purchase of Chattem stock for or on behalf of Person A.  [Doc. 1 at 7 ¶ 9].  He argues that, while the indictment generally alleges that he knowingly and willfully executed and attempted to execute a scheme or artifice to defraud, Count One "fails to put [him] on notice as to how his mental state embraced intent to deceive or cheat the Chattem board member, and/or anyone else in connection with the securities at issue, at any occasion throughout the entire course of action that Count One could possibly cover."  [Doc. 71 at 14-15 (emphasis omitted)].  He also asserts that fraudulent intent cannot be inferred because Count One "fails to allege a scheme or artifice to defraud or any execution of such a scheme as well."  [Id. at 15 (emphasis omitted)].  However, Melvin's arguments in this regard may be summarily addressed as it is clear that the government "is not required to prove its case in the indictment," but that it is "[o]nly when an indictment fails to charge all essential elements of a crime must it be dismissed," United States v. Staph, Criminal No. 09–42, 2010 WL 2884694, at *3 (W.D. Pa. July 21, 2010) (citation omitted), and here, the indictment sufficiently alleges that defendants knowingly and willfully executed and attempted to execute a scheme to defraud, see [Doc. 1]; United States v. Kent, 608 F.2d 542, 545 n.3 (5th Cir. 1979) (citation omitted) (finding indictment sufficiently alleged a fraudulent intent by charging that each act was done "knowingly" or "willfully"); see also Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir.

Berry, Cain, Jinks, and Person A, knowing that the information had been disclosed by Melvin in violation of his duties of trust and confidence owed to his clients, carried out the scheme to defraud for their own benefit by executing transactions in Chattem stock through personal online brokerage accounts, thereby earning illegal profits.  [Id. at 5 ¶¶ 4-6].  As in Slawson, the indictment also sets forth the dates, the

---

1981) (en banc) (noting decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit).  Indeed, "[a]n indictment must be read in its entirety and construed with 'common sense and practicality,'" United States v. Awad, 551 F.3d 930, 936 (9th Cir. 2009) (citation omitted), and "[i]t properly states the essential element of intent by alleging that [d]efendant[s] executed, or attempted to execute, a scheme to defraud . . . knowingly and [willfully]," United States v. Tsoa, No. 1:13cr137 (JCC), 2013 WL 3242700, at *3 (E.D. Va. June 25, 2013) (citation and internal marks omitted).  Melvin's suggestion that Count One fails to allege fraudulent intent because he merely "conveyed the client's tax questions to Person A, a licensed CPA and a principal at the same accounting firm, regarding the upcoming merger," [Doc. 71 at 15], is likewise without merit because "an indictment need not refute potential defenses in order to be valid, and the Court cannot make inferences regarding what the evidence will show at trial on a motion to dismiss," United States v. Rowland, Criminal No. 3:14cr79 (JBA), 2014 WL 3341690, at *10 (D. Conn. July 8, 2014) (citation omitted).  Moreover, the indictment specifically alleges that Melvin disclosed the inside information to Person A in violation of his duties of trust and confidence and with the understanding that the information would be used for the purpose of purchasing or selling Chattem securities and therefore sufficiently alleges fraudulent intent.  See [Doc. 1 at 5 ¶ 4].  And, while Melvin argues that the indictment fails to allege a crime under § 1348(2) because it does not assert that he obtained or attempted to obtain any money or property as a result of the alleged scheme, [Doc. 71 at 19], his argument ignores the allegations in the indictment that his misappropriation of the inside information aided and abetted others, including Person A, to trade in Chattem stock and earn illegal profits from the transactions.  [Doc. 1 at 5 ¶¶ 5-6].  Furthermore, the indictment alleges that Melvin misappropriated the non-public, confidential information under false and fraudulent pretenses, see [id. at 1 ¶ 1, 5 ¶¶ 3-5], which, despite Melvin's arguments to the contrary, [Doc. 71 at 22-23], is sufficient to allege a crime under § 1348(2).

transaction amounts, and the identity of the individual making the transaction.  [Id. at 6 ¶ 9].  Thus, "the essential elements of the charged crime, with details as to how the scheme operated– including time frame, participants and location, are pled in the indictment," Slawson, 2014 WL 5804191, at *7 (citations omitted), and the pending motions to dismiss for failure to allege a crime, [Docs. 46, 57, & 71], are due to be denied.[17]

**2.    *Failure to Negate all Indispensable Excuses, Exceptions, and Provisos***

Melvin also argues that Count One of the indictment should be dismissed because it fails to negate all indispensable excuses, exceptions, and provisos that relieve him of liability.  [Doc. 71 at 4-11].  Specifically, Melvin asserts that "[a]lthough Count One has attempted to identify acts constituting a violation of § 1348, it has failed to negate the existence of facts and circumstances known to the government under which [his] disclosure of the alleged inside information to Person A may well have been a lawful act."  [Id. at 10].  He surmises that "it could well be normal business practice that [he] and Person A, two partners at MRH, routinely exchanged in presumably privileged inter-office discussion, confidential information provided by clients for the purposes of receiving accounting services," and that the

---

[17] Having found that the indictment sufficiently alleges a crime, Jinks' additional requests for the government to proffer its evidence regarding his knowledge of the insider's receipt of a personal benefit and for the government to produce Grand Jury minutes, [Doc. 46 at 14-15], are due to be denied.

government "bears the burden of negating the existence of the exception to the offense of securities fraud, i.e., that Melvin's discussion of the Chattem board member's tax questions with Person A is right dealing in the business life." [Id. at 11 (emphasis and internal marks omitted)].

"It is the well-established rule that ordinarily an exception created by a proviso or other distinct or substantive clause, whether in the same section or elsewhere in the act, is defensive, and need not be negated in an indictment." Weare v. United States, 1 F.2d 617, 620 (8th Cir. 1924) (citations omitted). However, "[i]f the negation of an exception in the enacting clause of a statute is essential to accurately describe the offense, then the accusations of the indictment must [s]how how the accused is not within the exception." Id. Melvin, relying on case law dealing with express statutory exceptions, asserts that the government failed to negate an indispensable exception of § 1348 in the indictment. [Doc. 71 at 4-11]. In particular, he contends that because § 1348 does not define what constitutes a scheme to defraud, the definition of fraud has been judicially defined as the "departure from moral uprightness, fundamental honesty, fair play and candid dealings in the general life of members of society," [id. at 7-8 (emphasis, citations, and internal marks omitted)], and that "federal courts effectively established an indispensable exception to the statutory definition of the offense of fraud: acts that do not depart

from moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society," [id. at 9 (emphasis omitted)].

"In construing a statute[, however, the Court] must begin, and often should end as well, with the language of the statute itself." United States v. Kloess, 251 F.3d 941, 944 (11th Cir. 2001) (citation and internal marks omitted). No statutory exceptions are found in § 1348, see 18 U.S.C. § 1348, and where "[n]either an exception nor a proviso of any kind is contained in the act of Congress defining the offence," but "every ingredient of the offence therein defined is accurately and clearly described in the indictment," which is the case here, the indictment is sufficient, United States v. Cook, 84 U.S. 168, 177-78 (1872).[18] Simply put, "[i]t is not

---

[18] Moreover, even if the Court accepted Melvin's position that a judicially created exception applies and that it must be negated that he disclosed the inside information to Person A "to facilitate a completely legitimate purpose–rendition of tax advice to a client of the accounting firm," [Doc. 71 at 3, 10-11], this alleged exception would appear to be more properly deemed as an affirmative defense, see United States v. W.R. Grace, 429 F. Supp. 2d 1207, (D. Mont. 2006) (citations and internal marks omitted) ("When a statutory prohibition is broad and a defendant seeks to apply a narrow exception to the prohibition, it is more likely than not that the exception is an affirmative defense."), and "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required," United States v. Reece, Criminal No. 12–00146, 2013 WL 5234227, at *6 (W.D. La. Sept. 13, 2013), adopted at *1 (footnote and internal marks omitted). Rather, the merits of an affirmative defense "must be assessed based upon the evidence adduced at trial." United States v. Ferguson, 142 F. Supp. 2d 1350, 1359 (S.D. Fla. 2000). Furthermore, Melvin's argument based on United States v. Katz, 271 U.S. 354 (1926), see [Doc. 113 at 4-6], that there is an exception to the charged offense not expressly provided in § 1348, is unpersuasive since, even if the Court accepted Melvin's contention, the indictment has expressly negated the purported exception that he provided the

required that an indictment contain allegations negativing every possible theory of innocence of an accused, or such possible defenses as may be set up by the defendant," United States v. Greater Kan. City Retail Coal Merchants' Ass'n, 85 F. Supp. 503, 509 (W.D. Mo. 1949) (citations omitted), and Melvin's motion to dismiss Count One, [Doc. 71], on this basis, is due to be denied.

## C.   **Motion to Dismiss the Indictment Based on Double Jeopardy, [Doc. 75]**

Melvin also moves to dismiss the indictment on grounds of double jeopardy, [Doc. 75], asserting that the "government is barred from placing him in jeopardy again based upon the investigations related to and the evidence obtained from the previous civil and administrative proceedings, for which he has already been severely punished," [id. at 7]. Specifically, Melvin argues that the instant criminal prosecution is barred under the Fifth Amendment's Double Jeopardy Clause, and that it also violates his right to due process and the Eighth Amendment's prohibition against excessive fines. [Id. at 7-15].

In response, the government contends that the SEC sanctions at issue are clearly civil in nature and do not trigger the application of the Double Jeopardy

---

information to Person A for a lawful purpose since it specifically alleges that he disclosed the information in violation of his duties of trust and confidence, with the understanding that it would be used by Person A, and others, for the purpose of trading in Chattem stock, see [Doc. 1 at 5 ¶¶ 4-5]. Thus, Melvin's argument for dismissal would still fail for these reasons.

Clause, and that in any event, Melvin, who was represented by counsel when he agreed to the civil sanctions in the SEC civil action, waived any double jeopardy claim arising from the imposition of civil penalties in that action. [Doc. 95]. Melvin replies that the sanctions imposed against him in the SEC civil action and the administrative proceeding are so punitive that they are in fact criminal in nature, and that the waiver is inapplicable to the criminal charges presented here since he waived, at most, only double jeopardy claims based on the settlement of the insider trading action brought under specified portions of the Exchange Act of 1934 not at issue here. [Doc. 108].

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. CONST. amend. V. Double jeopardy bars successive prosecution for the same criminal offense. See Blockburger v. United States, 284 U.S. 299, 304 (1932). The Double Jeopardy Clause protects a defendant from (1) a second prosecution for the same offense after conviction; (2) a second prosecution for the same offense after acquittal; and (3) multiple punishments for the same offense.[19] Jones v. Thomas, 491 U.S. 376, 380-81 (1989).

---

[19] It is under the third category that Melvin brings his present motion to dismiss the indictment on grounds of double jeopardy. See [Doc. 75]. In particular, Melvin asserts that the instant criminal prosecution, coming after the SEC civil action and administrative proceeding, constitutes a successive punishment for the "same allegations" and the "same conduct," in violation of the Double Jeopardy Clause. [Id. at 9-10].

"Significantly, the 'Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, in common parlance, be described as punishment. The Clause protects only against the imposition of multiple criminal punishments for the same offense, and then only when such occurs in successive proceedings[.]'" United States v. Serrapio, 754 F.3d 1312, 1319 (11th Cir. 2014) (alteration in original) (citation omitted) (quoting Hudson v. United States, 522 U.S. 93, 98–99 (1997)). However, "a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goal of punishment." United States v. Doyer, 907 F. Supp. 1519, 1522 (M.D. Fla. 1995) (citation and internal marks omitted). "Thus, it is the character of the sanction that determines whether the sanction imposed is remedial or punitive in the criminal sense." Id. (citation omitted).

"'Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction.'" United States v. Bartlett, No. CR210–026, 2011 WL 1544206, at *1 (S.D. Ga. Mar. 15, 2011), adopted by 2011 WL 1543228, at *1 (S.D. Ga. Apr. 25, 2011) (quoting Hudson, 522 U.S. at 99). "A court must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." Id. (citation and internal marks omitted). "Even in those cases where the legislature has indicated an intention to

establish a civil penalty, a court should inquire further whether the statutory scheme was so punitive either in purpose or effect, as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." Id. (alteration in original) (footnote, citation, and internal marks omitted).[20]

"There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions." SEC v. Credit Bancorp, Ltd., 738 F. Supp. 2d 376, 389 (S.D.N.Y. 2010) (citations and internal marks omitted). Although the issue has not yet been addressed by the Eleventh Circuit, courts in other circuits have consistently found that the disgorgement of profits and penalties imposed under the Securities

---

[20] In making such a determination, the Supreme Court listed several factors to provide useful guideposts, including: (1) whether the sanction involves an affirmative disability or restraint; (2) whether the sanction has historically been regarded as punishment; (3) whether the sanction comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment– retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether the sanction appears excessive in relation to the alternative purpose assigned. Bartlett, 2011 WL 1544206, at *1 n.1 (citations and quotation marks omitted) (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)); see also United States v. Mayes, 158 F.3d 1215, 1221 (11th Cir. 1998). However, "'these factors must be considered in relation to the statute on its face, and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" Bartlett, 2011 WL 1544206, at *1 n.1 (quoting Hudson, 522 U.S. at 99-100).

Exchange Act of 1934 and SEC Rule 10b-5 were intended by Congress to be civil in nature, and are not "so punitive in purpose or effect as to override Congress's intent to provide for civil penalties," <u>SEC v. Palmisano</u>, 135 F.3d 860, 865-66 (2d Cir. 1998) (citation omitted) (finding disgorgement in the amount of $9.2 million and an additional civil penalty of $500,000, for violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5, among other violations, did not violate the Double Jeopardy Clause where defendant was also punished for the same conduct in a criminal proceeding as "neither disgorgement nor money penalties have historically been viewed as punishment," but "[are] [] sanction[s] that ha[ve] long been recognized as civil," and that there was "little indication, and certainly not the 'clearest proof,' required under *Hudson*, that disgorgement and the fines provided by the Remedies Act are criminal punishments"); <u>see also</u> <u>United States v. Van Waeyenberghe</u>, 481 F.3d 951, 956-59 (7th Cir. 2007) (citations omitted) (finding defendant's double jeopardy rights were not violated by criminal prosecution for mail and wire fraud and money laundering after he had been subject to a civil action by the SEC for the same conduct, resulting in a consent decree, in which defendant agreed to disgorge profits of $24.5 million plus $6.8 million in prejudgment interest as well as to pay a $110,000 civil penalty since the "SEC penalties on their face [were] civil in nature" and defendant had not advanced the "clearest proof" to override

legislative intent and transform a civil remedy into a criminal penalty, or offered any "analysis under *Hudson* as to why the injunction, disgorgement, and restitution required of him [were] anything other than equitable remedies that present no bar to subsequent criminal prosecution"); United States v. Perry, 152 F.3d 900, 903-04 (8th Cir. 1998) (citations omitted) (finding "SEC disgorgement remedies are not criminal punishments").

Despite Melvin's "arguments pointing out the unique circumstances of [his] case, the [C]ourt concludes that, like the sanctions in *Hudson*, the sanctions imposed in the [SEC] civil action[, including monetary penalties, professional debarment, and disgorgement,] do not implicate double jeopardy."[21]  United States v. Flood, No. 2:07–CR–485 DB, 2010 WL 1418880, at *5 (D. Utah Apr. 7, 2010); see also [Doc. 75 at 7-15; Doc. 108 at 2-9].  "These sanctions aren't historically viewed as punishment, nor do they involve an affirmative restraint," and the circumstances present here "fall outside the [C]ourt's double jeopardy analysis[.]"  Flood, 2010 WL 1418880, at

---

[21] Melvin asserts that since he did not trade in Chattem stock, nor did he obtain any ill-gotten gains from his co-defendants' securities transactions, that the "imposition of disgorgement disproportional to the defendant's personal financial gain could only be imposed to punish the defendant, thereby triggering the Double Jeopardy and Excessive Fine Clauses of the United States Constitution." [Doc. 75 at 11].  Melvin's argument in this regard, however, overlooks the fact that he agreed to disgorge those profits by way of consent decree, see SEC civil action, at [Doc. 51], and "the Excessive Fines Clause does not apply to restitution or disgorgement." U.S. Commodity Futures Trading Comm'n v. Parrilla, Civil Action No. 11–10621–JLT, 2013 WL 6979587, at *5 (D. Mass. Sept. 30, 2013) (footnote omitted).

*5. As Congress designated the penalties at issue as civil and has also "expressly endorsed [disgorgement]," Palmisano, 135 F.3d at 865 (citation omitted), and "[m]ost of the *Kennedy* factors described in *Hudson* point against a finding that the penalty is so punitive as to transform it into a criminal penalty," despite Congress' intent to the contrary, Grossfeld v. Commodity Futures Trading Comm'n, 137 F.3d 1300, 1303-04 (11th Cir. 1998) (footnote, citation, and internal marks omitted), Melvin's "arguments certainly do not rise to the level of the 'clearest proof' . . . to override the legislative intent to create a civil penalty," id. at 1304 (citations omitted).[22]

---

[22] The government also contends that Melvin waived his right to assert any claim of Double Jeopardy based upon the settlement of the SEC civil action. [Doc. 95 at 7]. Specifically, paragraph 10 of the consent decree entered in the SEC civil action provides in relevant part:

> Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Melvin in this civil proceeding. Melvin acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Melvin waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. . . .

[Doc. 95-1 at 5 ¶ 10]. The government asserts that Melvin was "aware that he was under criminal investigation for the conduct underlying the SEC lawsuit and represented by experienced criminal defense counsel who was in touch with the U.S. Attorney's office about this case well before [his] waiver." [Doc. 95 at 7]. In response, Melvin asserts that he did not waive his Double Jeopardy claims to challenge criminal charges brought under § 1348, but only the insider trading claims brought under parts of the Exchange Act and the SEC Rules at issue in the SEC civil

Accordingly, Melvin's motion to dismiss the indictment based on double jeopardy, [Doc. 75], is due to be denied.

**D.**     **Motions to Dismiss Counts Two through Seven as Multiplicitous and Counts One through Seven as Fatally Defective, [Doc. 80], & Counts Three through Six as Multiplicitous, [Doc. 82]**

Melvin also moves to dismiss Counts Two through Seven of the indictment as multiplicitous, asserting that those counts charge a single offense in multiple counts, and to dismiss Counts One through Seven as fatally defective. [Doc. 80]. He also separately moves to dismiss Counts Three through Six as multiplicitous. [Doc. 82]. The government has filed a consolidated response in opposition to these motions, [Doc. 96], and Melvin has filed a reply in support of his motions, [Docs. 111 & 112]. For the reasons that follow, Melvin's motions in this respect, [Docs. 80 & 82], are due to be denied.

---

action as indicated by the language in the consent decree, "in this civil proceeding." [Doc. 108 at 9-12]. Therefore, he asserts that the government "is prosecuting the instant matter under different claims from those identified in the consent and which originate from a separate and distinct statutory scheme," and that the consent decree "does not resolve the § 1348 securities fraud claims." [Id. at 11-12 (footnote, citation, and internal marks omitted)]. Because the Court finds that  the civil penalties imposed in the SEC civil action are not so punitive in character that they actually constitute a criminal punishment and that Double Jeopardy does not apply for that reason, "it is [] unnecessary to rely on the purported waiver in the consent decree," Van Waeyenberghe, 481 F.3d at 958, and the Court therefore declines to address this issue.

### 1.   *Multiplicity*

"An indictment is multiplicitous if it charges a single offense in more than one count." United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008) (citations omitted). "A multiplicitous indictment not only subjects the defendant to numerous sentences for one offense, but also prejudice[s] the defendant and confuse[s] the jury by suggesting that not one but several crimes have been committed." Id. (alterations in original) (footnote, citation, and internal marks omitted).  Therefore, "[a] multiplicitous indictment [] violates the principles of double jeopardy because it gives the jury numerous opportunities to convict the defendant for the same offense." Id. "To determine whether an indictment is multiplicitous, the Court first determines the 'allowable unit of prosecution.'"   United States v. Jones, No. 1:05-cr-617-WSD, 2007 WL 2301420, at *9 (N.D. Ga. July 18, 2007), adopted at *4 (citations and internal marks omitted).   "[C]ourts [] determine the unit of prosecution by reference to the conduct alleged, applying the following rule: Whether a transaction results in the commission of one or more offenses is determined by whether separate and distinct acts made punishable by law have been committed." Id. at *10 (citations and internal marks omitted).  "The principle underlying this rule is that the 'unit of prosecution' for a crime is the *actus reus*, the physical conduct of the defendant." Id. (citation omitted).

Melvin asserts that Counts Two through Seven are multiplicitous because the indictment alleges, at most, that he disclosed inside information to others which is only one violation of § 1348 and that "[e]ach transaction of Chattem stocks as alleged in Counts Two through Seven, even though possibly qualifying as the execution of a § 1348 scheme one of his co-defendants might have engaged in, it is not the basis of a separate indictable offense against [him]." [Doc. 80 at 7].[23] While the Court finds that the challenged counts are not multiplicitous for the reasons asserted by the government in its opposition, see [Doc. 96 at 2-6],[24] the Court need not discuss

_____

[23] Similarly, Melvin separately argues that Counts Three though Six, which relate specifically to co-defendant Cain, are multiplicitous because he "is not alleged to have executed the scheme with which he is charged by 'tipping' Cain four times, he is alleged to have executed his scheme once by telling Cain the insider information he had learned regarding the stock," and that the fact that Cain "acted four different times after Melvin passed the information and his scheme had been executed, is of no consequence[.]" [Doc. 82 at 5-6].

[24] Indeed, despite Melvin's arguments in support of dismissal of the challenged counts, see [Doc. 80 at 5 (citing United States v. Lemons, 941 F.2d 309 (5th Cir. 1991) (per curiam))], "a single scheme can be executed a number of times, and a defendant may be charged in separate counts for each execution of the scheme to defraud." United States v. McMath, No. CR413–003, 2013 WL 5799004, at *9 (S.D. Ga. Oct. 16, 2013) (citations and internal marks omitted); see also United States v. Gallant, 537 F.3d 1202, 1226 (10th Cir. 2008). And, "[w]hen an act is chronologically and substantively independent from the other acts charged as the scheme, it constitutes an execution," resulting in punishment for each "transmission that carries out [the] scheme." McLean v. United States, Civil No. 3:07cv331, Criminal No. 3:02cr156–1, 2011 WL 148313, at *19 (W.D.N.C. Jan. 18, 2011) (second alteration in original) (citations and internal marks omitted). Melvin even admits that "Counts One through Seven charge seven distinct and separate crimes committed on December 4, December 7, December 10, December 11, and December 15 of 2009. See

39

this issue at length since, even if "[a]n indictment . . . charging the same offense in more than one count is multiplicitous," it is "not fatal and does not require dismissal of the indictment," United States v. Siegelman, 2:05 CR 119 MEF, 2006 WL 752951, at *3 (M.D. Ala. Mar. 22, 2006) (alterations in original) (footnote, citation, and internal marks omitted).  Indeed, "there are less severe remedies available to alleviate potential prejudice," including "by offering appropriate instructions to the jury."  Id. (citation omitted); see also United States v. Pefanis, Criminal Action No. 1:10–CR–0513–RWS–CCH, 2011 WL 1134310, at *3 (N.D. Ga. Mar. 1, 2011), adopted by 2011 WL 1113954, at *1 (N.D. Ga. Mar. 25, 2011) (citation omitted).  In fact, "should the evidence at trial demonstrate that the charges were improperly multiplied, the trial court can still remedy any violation by consolidating the counts or requiring dismissal," and, "even after a verdict, any error may be remedied by vacating multiplicitous convictions and any concurrent convictions based upon those convictions."  United States v. Ford, Criminal Action No. 1:12–CR–297–TWT–ECS–1, 2013 WL 1337130, at *2 n.3 (N.D. Ga. Mar. 5, 2013), adopted by 2013 WL 1320739, at *1 (N.D. Ga. Mar. 29, 2013) (citations omitted); see also United States v. Bobo, No. CRA 1:06CR0172-02 TW, 2007 WL 962978, at *4 (N.D. Ga. Feb. 20, 2007).  Accordingly, Melvin's motions to dismiss Counts Two through

---

[Doc. 80 at 10].

Seven, [Doc. 80], and separately Counts Three through Six, [Doc. 82], as multiplicitous are due to be denied.

### 2.   *Fatally Defective*

Melvin also contends that Counts One through Seven are fatally defective "in that they fail to allege an act that would constitute the execution of the scheme charged in paragraphs 3, 4 and 5 of the indictment, i.e., that he misappropriated and then disclosed the inside information."   [Doc. 112 at 7 (emphasis and citation omitted)]; see also [Doc. 80 at 7-11].   In this regard, Melvin points out that the "particulars of Counts One through Seven identified in paragraph 9 of the indictment, and set out in the individual counts reflected on the chart at page 7, are grounded upon transactions in Chattem stock, which are at best examples of the other Co-Defendants' acts of insider trading; but, in no event are they elements of the scheme to defraud in which the government has alleged [he] engaged," and "the Indictment never suggests in those critical paragraphs that on the date of offenses alleged, Melvin provided any insider information to a Co-Defendant who is charged in the same count."   [Doc. 80 at 8-10].   Melvin's arguments notwithstanding, the Court finds that Counts One through Seven are not fatally deficient.

Quite simply, the Court "is not persuaded that the charges are faulty." United States v. Quinones, No. CR410–223, 2012 WL 2064705, at *5 (S.D. Ga. May 22, 2012),

adopted by 2012 WL 2064847, at *1 (S.D. Ga. June 6, 2012).  The indictment

"incorporate[s] the elements of the offenses, [is] definite as to time, place, means,

and motivation, [and] allege[s] the necessary scienter and jurisdictional

components." Id. "In other words, [the indictment is] sufficiently specific to apprise

the defendant of the charges against him, and [it] can be relied upon to shield him

from further prosecutions for the same crimes," and "[n]othing more is required."

Id. (citations omitted); see also United States v. Reddy, 534 F. App'x 866, 877 (11th

Cir. 2013) (unpublished) (footnote and citations omitted) ("When an Indictment's

language generally tracks the statutory language, the Indictment is sufficient to

withstand a motion to dismiss.").  Indeed, in reading the indictment, Melvin ignores

the plain language of the charges, "as well as allegations contained elsewhere in the

indictment." United States v. Dempsey, 768 F. Supp. 1256, 1275 (N.D. Ill. 1990).  The

indictment clearly tracks the language of § 1348, and alleges a scheme to defraud

over a discrete period of time– December 4, 2009, to January 14, 2009, to illegally

profit off of the trading of Chattem stock based on non-public inside information,

which is a "plain, concise, and definite written statement of the essential facts

constituting the offense charged[.]"  Fed. R. Crim. P. 7(c)(1), see also United States

v. Lentz, No. CR406-376, 2007 WL 2177068, at *2 (S.D. Ga. July 25, 2007).

In addition, the indictment charged Melvin with aiding and abetting under 18 U.S.C. § 2, and "[t]he counts track the language of the statutes allegedly violated, identify the goal  of the scheme, identify the approximate time frame of the events, and specify the claims submitted in furtherance of the scheme to defraud[.]" Lentz, 2007 WL 2177068, at *3 (citation omitted).  And, the government need not show that Melvin "traded on Chattem stock or that anyone else made such a transaction on his behalf," as he contends, see [Doc. 80 at 8], but rather that the trading of the shares by the co-defendants was for the purpose of executing the scheme, see United States v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007) (footnote omitted) ("For nearly as long as mail fraud has been a federal crime, it has been the law in this Circuit, and in the former Fifth Circuit, that a defendant may be convicted of mail fraud without personally committing each and every element of mail fraud, so long as the defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme."); United States v. Munoz, 430 F.3d 1357, 1369 (11th Cir. 2005) (citation and internal marks omitted) ("It is well settled in this circuit that so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails."); see also United States v. Odu, 9 F.3d 104 (5th Cir. 1993) (per curiam); Smith v. United States, 61 F.2d 681, 685 (5th

Cir. 1932) (citations omitted) (noting in a scheme to defraud case that the "guilt of the accused who were on trial was not dependent upon either of them taking part in causing the alleged use of the mails, if another accused who was a party to the alleged scheme to defraud . . . in pursuance of that scheme and for the purpose of executing it or attempting to do so, knowingly caused the alleged use of the mails"); United States v. Kelly, 507 F. Supp. 495, 504 n.15 (E.D. Pa. 1981) (citations omitted) ("It is well settled . . . once the existence of a scheme to defraud is established . . . that when one coschemer utilizes the mails in furtherance of the scheme to defraud, all other coschemers are thereby implicated."). In fact, § 1348(1) "makes it unlawful to defraud any person in connection with any security," and § 1348(2) "makes it unlawful to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any security," but "[n]either subsection require[s] that the [d]efendant purchase or sell securities." United States v. Hatfield, No. 06–CR–0550 (JS), 2009 WL 2182593, at *4 (E.D.N.Y. July 22, 2009) (internal marks omitted). "In reviewing the sufficiency of an indictment, a court's inquiry should be not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards," United States v. Vrdolyak, 536 F. Supp. 2d 899, (N.D. Ill. 2008) (citation and internal marks omitted), and here, it does. Accordingly, Melvin's

44

motion to dismiss Counts One through Seven as fatally deficient, [Doc. 80], is due to be denied.

**E.    Motion to Suppress Evidence obtained from Parallel Proceedings, [Doc. 84]**

Melvin moves to suppress evidence obtained from the SEC during its investigation into insider trading, arguing that the SEC civil proceeding denied him due process because it was a subterfuge to obtain evidence for use in the instant criminal indictment and was, therefore, impermissibly commingled with the criminal investigation and a departure from the proper administration of criminal justice, and that the United States secured evidence from him in violation of his Fifth Amendment right against self-incrimination.  See [Doc. 84].[25]  In its response in opposition, the government asserts that Melvin's motion should be denied because he "cannot establish that [the] evidence was the product of anything other than routine information sharing in parallel investigations."  [Doc. 94 at 1].

---

[25] Melvin has not requested an evidentiary hearing, see generally [Doc. 84], and it is within the court's sound discretion whether to hold a hearing, subject to review only for an abuse of that discretion, United States v. Slocum, 708 F.2d 587, 600 (11th Cir. 1983); see also United States v. Schlei, 122 F.3d 944, 990 (11th Cir. 1997).  And, such a hearing is not appropriate unless Melvin can make an unrebutted prima facie showing of prosecutorial misconduct.  See United States v. Moses, 219 F. App'x 847, 849-50 (11th Cir. 2007) (per curiam) (unpublished) (finding the district court did not abuse its discretion by denying an evidentiary hearing where defendant failed to show a prima facie case of government misconduct between the SEC and criminal investigations).  In the absence of a prima facie showing of misconduct, the Court will not provide Melvin an evidentiary hearing.

"It is well established that the federal government may pursue civil and criminal actions either 'simultaneously or successively[.]'" Moses, 219 F. App'x at 849 (quoting Standard Sanitary Mfg. Co., 226 U.S. 20, 52 (1912)). It is also well settled that the SEC is authorized pursuant to § 21(d) of the Securities and Exchange Act, 15 U.S.C. § 78u(d), to furnish the Department of Justice ("DOJ"), with evidence of misconduct it has uncovered in its civil proceedings. See id. (citation omitted) ("[A] federal statute expressly allows the SEC and the [DOJ] to share information relating to parallel investigations"). However, "the SEC and the [United States Attorney's Office ('USAO')] must keep their investigations on parallel tracks and cannot merge them by, for example, having the SEC take actions or seek evidence solely for the benefit of or at the direction of the USAO." United States v. Harris, Criminal Action File No. 1:09–cr–0406–TCB–JFK, 2010 WL 4967821, at *3 (N.D. Ga. Dec. 1, 2010) (citation omitted). That is, "[a]lthough the sharing of information between the SEC and the USAO is permitted, [c]ourts have placed restrictions on how information may be obtained and shared," in that "the SEC must pursue evidence in the good-faith pursuit of its own interests, and not merely to advance a criminal prosecution" and "the SEC may not actively conceal the possibility of criminal proceedings." Id.; see also United States v. Kordel, 397 U.S. 1, 12-13 (1970).

Melvin alleges that "the circumstances [] reflect an extremely serious overlap in the civil and criminal investigations which were . . . no longer parallel but were commingled," [Doc. 84 at 10 (emphasis, citation, and internal marks omitted)], and that statements and documents he provided to the SEC prior to him "being formally advised that he was the 'Target' in a criminal investigation . . . should be suppressed as they were obtained in violation of his Fifth Amendment rights; and/or they were offered with the specific hope of not being prosecuted," [id. at 11]. However, Melvin "has not pointed to any evidence that the SEC conducted its investigation into [his] violations of federal securities laws in order to pursue a criminal investigation in cooperation with the [USAO]." United States v. Kowalewski, Criminal Action No. 2:13–CR–00045–RWS, 2014 WL 6667127, at *20 (N.D. Ga. Nov. 24, 2014), adopted at *1. Indeed, other than speculating that the government "impermissibly commingled" the civil and criminal investigations because it appears that only 13 pages of the 200,000 pages of discovery provided by the government "are the product of the DOJ's labor or some other investigative effort outside of the previous civil actions," and that "[a]bsent the evidence obtained from [him] and his business in the civil cases, the mere thirteen (13) pages of FBI reports are far from sufficient to bring this criminal prosecution," [Doc. 84 at 8-10], he has failed to present any evidence that "demonstrates the SEC's civil investigation and the [g]overnment's

criminal investigation . . . were so intertwined."[26] <u>Kowalewski</u>, 2014 WL 6667127, at *20.  Melvin's assertion that the "fact the [SEC] passed on information to the [USAO] (which is all that this record substantiates) demonstrates that the [SEC] litigation and the criminal investigation merged misunderstands the type of interaction required for the court to find a due process violation." <u>United States v. Harris</u>, Criminal Case No. 1:09–CR–0406–TCB–JFK, 2010 WL 4962981, at *14 (N.D. Ga. Oct. 22, 2010), adopted by 2010 WL 4967821, at *5.  The civil investigation was unquestionably initiated first, and the "mere fact that included in the discovery materials were documents originating with the SEC does not support a conclusion that the SEC was part of a joint criminal investigation, that joint meetings were held, or that resources of the SEC were utilized in the criminal investigation under the direction and supervision of the federal prosecutors." <u>Slawson</u>, 2014 WL 5804191, at *16.  In fact, as previously noted, the SEC's regulations "contemplate, and courts have universally approved, the passing of information– particularly from the [SEC] to the criminal investigative agency," <u>Harris</u>, 2010 WL 4962981, at *14 (citation

---

[26] In fact, the government points out that Melvin's argument with regard to the discovery that has been produced is "factually and legally incorrect," in that "over ten thousand pages of discovery were provided that did not originate with the SEC." <u>See</u> [Doc. 94 at 7].

omitted), and Melvin's vague and conclusory assertions in this regard are without merit.[27]

Melvin also asserts that his Fifth Amendment right against self-incrimination has been violated since he provided documents and testified under oath during the course of the SEC civil action "prior to [] being formally advised that he was the 'Target' in a criminal investigation[.]"  [Doc. 84 at 11].  This is not the first time an individual has given testimony in a civil proceeding that was later sought to be used against him in a criminal proceeding, and civil depositions may be admitted as party admissions in criminal trials.  Bass v. United States, 409 F.2d 179, 180 (5th Cir. 1969).  And here, the record belies Melvin's assertions and indisputably shows that he was directly advised prior to the start of his civil deposition testimony that "facts uncovered during this investigation might constitute violations of the federal

_____

[27] Although Melvin cites SEC v. HealthSouth Corp., 261 F. Supp. 2d 1298 (N.D. Ala. 2003), to support his position that the use of discovery materials from the SEC civil investigation in the criminal investigation demonstrates that the two investigations were intertwined and merged at some point, see [Doc. 84 at 9], his reliance on that case is misplaced.  Indeed, in the HealthSouth case, the district court questioned the SEC's use of criminal discovery in the civil proceeding to freeze assets that was not discoverable to the defendant, noting that "it [was] obvious . . . that the FBI was using [the] civil proceeding to glean evidence it may use in its criminal investigation of defendant[.]"  Id. at 1311. In particular, the Court stated that it "question[ed] the SEC, a civil investigatory body, for its use of the FBI to undertake discovery for this civil action, when the consequence of such methods is that the product of the FBI's labor is non-discoverable to the defendant in this civil proceeding."  Id. at 1305 (citation omitted).  This is simply not the situation present here, and the HealthSouth case is inapposite.

securities law or of other . . . state or federal civil or criminal laws," and he was explicitly asked whether he understood that "there is also a pending criminal investigation into this subject matter," to which he replied, "Yes, sir," while also invoking his Fifth Amendment privilege against self-incrimination in response to certain questions.   [Doc. 94-1 at 3-4].   To the extent Melvin argues that any statements obtained or discovery provided prior to him being advised of the pending criminal investigation should be suppressed since he was not first warned that the information may be related to criminal prosecutors, he has not shown "any affirmative misrepresentation, trickery or deceit by the [SEC] in conducting civil discovery during the civil litigation." Harris, 2010 WL 4962981, at *15.  All that is required is that a "government official [] not 'affirmatively mislead' the subject of a parallel civil and criminal investigation[] 'into believing that the investigation is exclusively civil in nature and will not lead to criminal charges,'" id. (citations omitted) (quoting United States v. Stringer, 535 F.3d 929, 940 (9th Cir. 2008)), and here, not only has Melvin not shown that the government affirmatively misled him in any way, but the record shows that the SEC specifically advised him of the pending criminal investigation, see [Doc. 94-1].

Despite the lack of evidence showing any sort of misconduct in conducting the civil and criminal investigations, Melvin relies heavily on a line of cases where

courts have concluded that there was prosecutorial misconduct through the most egregious abuses of parallel proceedings by the government. See [Doc. 84 at 7-8, 10, 12 (citing United States v. Scrushy, 366 F. Supp. 2d 1134 (N.D. Ala. 2005); United States v. Parrott, 248 F. Supp. 196 (D.D.C. 1965))]. However, these cases are distinguishable. In Scrushy, the district court suppressed SEC deposition testimony the defendant gave and dismissed the perjury counts based on that testimony, concluding that the government had manipulated the civil investigation for its own purposes when testimony from a senior accountant with the SEC at trial revealed that the SEC took explicit directions from the USAO for the Northern District of Alabama regarding the venue and content of the deposition. Scrushy, 366 F. Supp. 2d at 1140. The district court invoked its supervisory authority to exclude the deposition, finding that the government had departed from the proper administration of criminal justice. Id.

In Parrott, the SEC initiated a civil injunctive action against the defendants. Parrot, 248 F. Supp. at 198. More than six months before the trial on the injunctive action, the SEC recommended criminal prosecution of these defendants. Id. at 199. The defendants were not informed of the recommended criminal prosecution, nor were they warned of their Fifth Amendment rights against self-incrimination. Subsequently, their depositions were taken in preparation for the trial. Id. Less than

51

a month after the civil trial, the SEC initiated a revocation proceeding that involved some of the same defendants from the previous civil trial.  At this hearing, the SEC attorney denied that criminal proceedings had been instituted against any of the defendants, and the defendants subsequently testified.  Id.  In fact, the criminal prosecutor intentionally concealed his identity when he attended the SEC civil deposition.  Id.  Under these facts, the district court found that "the [g]overnment may not bring a parallel civil proceeding and avail itself of civil discovery devices to obtain evidence for subsequent criminal prosecution."  Id. at 202.  The present case simply does not fall within the egregious circumstances set forth in the district court cases discussed above, and despite Melvin's assertions that the SEC somehow cooperated with the DOJ in the parallel proceedings, the record does not support that assertion.

In short, Melvin has offered only conclusory allegations, but no evidence, that the SEC investigation and proceeding was a ruse, agreed upon by the SEC and DOJ in collusion to obtain incriminating evidence for use in a subsequent criminal proceeding.  Moreover, the instant indictment was filed more than two years after the SEC filed its civil complaint, and the SEC retained its own case and pressed its civil claims independently of any criminal investigation or proceeding.[28]  And, at the

---

[28] Melvin argues that the "substantial delay in bringing the instant criminal prosecution not only seems orchestrated, but has materially prejudiced [him]."

time Melvin provided his deposition testimony in the SEC civil action, he was represented by counsel and specifically advised that there was a pending criminal investigation and of his Fifth Amendment privilege.  [Doc. 94-1].  Thus, Melvin has failed to make the requisite prima facie showing of governmental misconduct which

---

[Doc. 84 at 12].  He relies on Parrott to support his proposition, see [id.]; however, as previously discussed, Parrott is factually distinguishable and simply inapplicable. Indeed, in Parrott, the district court dismissed the indictment on speedy trial grounds when the government never disclosed the existence of the criminal investigation during the parallel SEC action, and the defendant showed that he was prejudiced from the 22-month delay as a result because he had to disclose his defense in the civil case "long in advance of the indictment," and because critical witnesses subsequently became unavailable due to death or serious illness.  248 F. Supp. at 203-06 (footnote omitted).  Courts have "refused to adopt Parrott as the law of this circuit," United States v. Willis, 583 F.2d 203, 208 n.5 (5th Cir. 1978) (citation omitted), and "[e]ven if Parrott was the applicable law of this Circuit– which it is not– the case would not be applicable to the situation at hand, for [Melvin has] not sufficiently demonstrated any prejudice stemming from the lapse of time prior to indictment," Kroll v. United States, 433 F.2d 1282, 1286 (5th Cir. 1970); see also United States v. Livengood, 427 F.2d 420, 422 (9th Cir. 1970).  That is, Melvin "shoulders the burden of show[ing] that pre-indictment delay was deliberate for the purpose of tactical advantage," which he could establish by showing "either that the government acted in bad faith by intentionally delaying the prosecution to cause him prejudice or that the government ma[de] a judgment about how it [could] best proceed with litigation  to gain an advantage over the defendant and, as a result of that judgment, [the] indictment [was] delayed."  United States v. Baquis-Serrano, Civil Action No. 1:13–CR–176–CAP–AJB, 2013 WL 5781611, at *3 (N.D. Ga. Oct. 25, 2013), adopted at *1 (alterations in original) (citations and internal marks omitted). Melvin has not offered any evidence of bad faith, nor has he identified any prejudice he suffered as a result of the delay, offering instead that any prejudice "may be presumed," [Doc. 84 at 12], and he "has not satisfied this standard," Baquis-Serrano, 2013 WL 5781611, at *3.

would entitle him to the suppression of evidence, or warrant an evidentiary hearing. Accordingly, Melvin's motion to suppress evidence, [Doc. 84], is due to be denied.

**F.**     **Motion to Dismiss the Indictment Based on Collateral Estoppel, [Doc. 86]**

Melvin has moved to dismiss the indictment on the basis of collateral estoppel, [Doc. 86], and Berry has moved to adopt this motion, [Doc. 87]. Specifically, Melvin asserts that an essential element of the offense of insider trading also applies to the § 1348 scheme alleged in the indictment (i.e., "whether he received any financial or material benefit from the acts of insider trading which constitute the scheme to defraud alleged in the indictment against him"), see [Doc. 110 at 1], and has already been decided in his favor and "fully litigated" during the SEC administrative proceedings, and that the government "is now precluded from alleging, offering evidence in support of or attempting to prove that he did under the principal of Collateral Estoppel," [Doc. 86 at 7-8].

In support of this argument, Melvin points to a decision issued by ALJ Murray in the SEC administrative proceeding that followed the settlement of the SEC civil action.  In particular, based on Melvin's consent in the SEC civil action, a final judgment was entered, permanently enjoining Melvin from committing violations of §§ 10(b) and 14(e) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14e-3, and finding him liable for disgorgement, prejudgment interest, and a

civil penalty, obligating him to pay $177,756.59 to the SEC.  [Doc. 110-2 at 52-66]**.**

Subsequently, on December 20, 2013, the SEC temporarily suspended Melvin from

the practice of accounting before the Commission.  See [id. at 10].  Melvin petitioned

the SEC to set aside the temporary suspension, see [id. at 11], and on March 20, 2014,

the SEC denied his request to lift the temporary suspension and ordered that the

matter be set for a hearing, [id.].  The SEC moved for a summary disposition, see [id.

at 5-13], which Melvin opposed, [Doc. 110-3 at 1-3], asserting that summary

disposition was inappropriate because, among other reasons not relevant here, there

was a "dispute of material fact concerning whether the staff of the Commission

entered into a binding agreement as to any suspension to be imposed upon [him]"

in that the "binding agreement was that [he] would not be suspended in excess of

three years," [id. at 1].[29]

On September 22, 2014, ALJ Murray issued an "Initial Decision," which

Melvin now relies on in support of his collateral estoppel argument, finding that

there was a material dispute as to whether the parties had agreed in the SEC civil

action that Melvin would only be held to a maximum three-year suspension.

---

[29] Specifically, Melvin asserted that he discussed an agreement with the SEC's
attorney in conjunction with his settlement of the SEC civil action that he would not
be banned from practicing in front of the SEC for any period in excess of three years,
but that he was not made aware of the SEC's intention to not honor that agreement
until January, 2014, after the SEC issued its December, 2013, order temporarily
suspending him.  See [Doc. 110-3 at 2-3].

See [Doc. 110-4].  In her Findings of Fact, ALJ Murray summarized the allegations against Melvin in the SEC civil action and the procedural history of that case, including his settlement of that case, noting that he was "ultimately responsible for the trading of at least ten individuals on material non-public information."  [Id. at 5-6 (citation omitted)].  ALJ Murray also stated that there was "no evidence that Melvin received, or made arrangements to receive, any financial or material benefit from his disclosures," [id. at 6], and she later explained that while Melvin's "motivation for misappropriating the material non-public information [was] unknown" and the "Complaint [did] not allege that Melvin traded on the material non-public information or that he shared in the financial gain of the four individuals with whom he shared the information," that it appeared that the "disclosure of the material non-public information allowed Melvin to further his personal and/or professional relationship in a small town with the four individuals," [id. at 8 (citation omitted)].  She further noted that Melvin had "offered no arguments why he should not be censured or temporarily or permanently disqualified" and that he had not "provided any evidence recognizing his wrongdoing, nor [had] he provided any assurances against future violations."  [Id.].

After considering the parties' positions, ALJ Murray concluded that the "dispute [was] one of misunderstanding," that there was no executed agreement

between Melvin and the SEC for a three-year suspension or evidence that the recommendation was even made to the Commission, and that the only remaining issue was whether Melvin "should be censured or disqualified from appearing or practicing before the Commission for a period of time or permanently." See [id. at 6-7 (citation omitted)].   Ultimately, ALJ Murray ordered that Melvin be "permanently disqualified from practice before the [SEC] pursuant to Rule 102(e)(3)(iii) of the Commission's Rules of Practice."  [Id. at 9].

Melvin argues that "it is clear that the issue regarding the benefit received by [him] as a result of his participation in the insider trading scheme[, which he contends was a critical and necessary part of the decision,] was raised, litigated and decided in his favor during [the] course of the prior civil proceedings on this matter," and that "because the government is now collaterally estopped from proving one of the essential elements of the insider trading scheme alleged in the indictment against him, the indictment must be dismissed." [Doc. 110 at 5].  The government opposes Melvin's motion, [Doc. 97], asserting that he "cannot meet his burden on any of the requirements to apply collateral estoppel," [id. at 6].  The Court agrees, and finds that the doctrine of collateral estoppel is inapplicable in this case.

"The doctrine of collateral estoppel may be applicable where the first cause of action was civil and the second was criminal." United States v. Rogers, 960 F.2d

1501, 1507 (10th Cir. 1992) (citation omitted) (citing Yates v. United States, 354 U.S. 298, 335 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978)).  "The doctrine 'means simply that when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" United States v. Ward, 808 F. Supp. 803, 817 (S.D. Ga. 1992) (quoting Ashe v. Swenson, 397 U.S. 436, 443 (1970)). For collateral estoppel to apply, a party must show:

> (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been 'a critical and necessary part' of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

Christo v. Padgett, 223 F.3d 1324, 1339 (11th Cir. 2000) (quoting Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998)).  "[I]n criminal cases, the rule of collateral estoppel is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." Ward, 808 F. Supp. at 817 (citation and internal marks omitted).

As applied here, Melvin has clearly failed to show that the issue he seeks to have precluded was actually litigated in the administrative proceeding, or that it was a critical and necessary part of the administrative judgment.  Indeed, Melvin reached a settlement in the SEC civil action, and the only issue that remained in the

administrative proceeding was whether the parties had agreed to a maximum three-year ban on his practicing before the Commission, or whether the appropriate remedial sanction was a permanent ban. See [Doc. 110-4]. While ALJ Murray noted in her Findings of Fact that there was no evidence that Melvin had "received, or made arrangements to receive, any financial or material benefit from his disclosures," [id. at 6], it does not appear from those proceedings that this issue was actually litigated, or even raised as an issue to be decided, in the administrative action, see Cmty. State Bank v. Strong, 651 F.3d 1241, 1268 (11th Cir. 2011) (citation omitted) ("Requiring that issues be 'actually litigated' ensures that collateral estoppel precludes only those issues that were contested by the parties"), nor does it appear to have been a critical and necessary part of the decision in light of the fact that ALJ Murray ruled against Melvin by permanently disqualifying him from practicing before the Commission, [Doc. 110-4 at 9]; see also United States v. Modanlo, 493 B.R. 469, 474 (D. Md. 2013) (citation and internal marks omitted) ("Even where the issue was previously fully litigated and the prior court has made a pertinent finding, the prior judgment will not foreclose reconsideration of the same issue if that issue was not necessary to the rendering of the prior judgment, and hence was incidental, collateral, or immaterial to that judgment."). Furthermore, a review of ALJ Murray's entire decision shows that, while she found no evidence that

Melvin had received or planned to receive any "financial or material benefit" from his disclosure on non-public information, she also found that the disclosure allowed him to further his personal and/or professional relationship in a small town with the four individuals he shared the information with, [id. at 6, 8], and thus, it only appears that she concluded that there was no evidence of a pecuniary gain, but that he did receive some sort of personal benefit, which is "broadly defined to include not only pecuniary gain, but also . . . any reputational benefit that will translate into future earnings and the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend," Newman, 773 F.3d at 452 (citation and internal marks omitted).[30]   Thus, Melvin has failed to show that the issue he claims is precluded was actually litigated in the civil and administrative proceedings, or that it was even a critical and necessary part of ALJ Murray's decision, and he has therefore failed to show that collateral estoppel applies in this

---

[30] The Second Circuit also noted that the government may not prove the "receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature," Newman, 773 F.3d at 452, and Melvin relies on this statement in support of his argument for dismissal of the indictment, see [Doc. 86 at 10-11]; however, this only highlights the fact that ALJ Murray did not, as Melvin suggests, reach a clear factual or legal determination on the personal benefit issue since she found no evidence of a financial or material benefit, but then appears to have nonetheless found a personal benefit sufficient to impose a remedial sanction in the form of a permanent disqualification from practice before the Commission for insider trading.  Furthermore, as previously discussed, proof of a personal benefit is not an element under § 1348, see Slawson, 2014 WL 5804191, at *6, and Newman simply does not apply to the facts and charges at issue in this case.

case.[31]  Accordingly, Melvin's motion to dismiss the indictment based on collateral estoppel, [Doc. 86], is due to be denied.

### III.  CONCLUSION

For the foregoing reasons and cited authority, Melvin's motion to supplement his motion to dismiss the indictment, [Doc. 83], and Melvin and Berry's motions to adopt, [Docs. 72 & 87], are hereby **GRANTED**, and it is **RECOMMENDED** that the pending motions to dismiss and to suppress, [Docs. 46, 48, 51, 57, 71, 75, 80, 82, 84, & 86], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 27th day of May, 2015.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[31] Having found that Melvin has failed to meet at least two of the requirements for collateral estoppel to apply, the Court need not address the remaining factors.

61