IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

THOMAS D. MELVIN, C. ROAN
BERRY, MICHAEL S. CAIN, and
JOEL C. JINKS,

      Defendants.

CRIMINAL ACTION

NUMBER 3:14-cr-00022-TCB

## **O R D E R**

This case comes before the Court on Defendants' objections to
Magistrate Judge Russell G. Vineyard's non-final report and
recommendation [99], recommending denial of Defendants' motions to
sever [40 & 53] and motions to strike surplusage [42, 54 & 56-1], and
his final report and recommendation [118], recommending denial of
Defendants' pending motions to dismiss the indictment and motion to
suppress evidence [46, 48, 51, 57, 71, 75, 80, 82, 84 & 86]. Also before
the Court are Berry's motion for reconsideration of Judge Vineyard's
ruling on his motion for a bill of particulars [104] and Cain's motion for

a speedy trial [43], motion to expedite the trial date [88], and supplemental motion to sever [137].

## I.    Background

On December 2, 2014, a grand jury returned an indictment against Defendants Thomas D. Melvin, C. Roan Berry, Michael S. Cain, and Joel C. Jinks, charging seven counts of securities fraud in violation of 18 U.S.C. §§ 1348 and 2. The indictment alleges that from about December 4, 2009 through January 14, 2010, Defendants knowingly and willfully executed and attempted to execute "a scheme and artifice (1) to defraud other persons in connection with stock securities of Chattem, Inc. and (2) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of stock" of Chattem, Inc. [1] at ¶ 1.

According to the indictment, Defendant Melvin was a certified public accountant licensed in Georgia and a partner in the accounting firm of Melvin, Rooks & Howell in Griffin, Georgia. He served as the

2

personal accountant for Defendants Berry, Cain, and Jinks. Berry and Jinks were small-business owners, and Melvin maintained a close personal friendship with each of them and provided accounting services to them and their businesses. Cain was a senior vice president at Morgan Stanley Smith Barney, and in connection with this position he was a securities broker who traded securities on behalf of himself and his clients. Melvin served as Cain's accountant for personal tax services, and Cain and Melvin referred clients to each other. Cain also managed the retirement accounts of Melvin, Rooks & Howell.

According to the indictment, Chattem, an over-the-counter pharmaceutical manufacturer, was a public company whose stock was traded on the NASDAQ stock market. Chattem's securities were registered with the U.S. Securities and Exchange Commission (the "SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and it was required to file reports with the SEC pursuant to Section 15(d) of the Exchange Act.

3

Around late 2009, Chattem entered into discussions with Sanofi-Aventis, a French pharmaceutical company, regarding Sanofi's potential acquisition of Chattem. Around November 2009, Chattem's board of directors held a series of confidential meetings in which they discussed Sanofi's proposed acquisition of Chattem at a price of over $90 per share.

Melvin provided accounting services to one of Chattem's board members who was present in the November 2009 board meetings. Around December 4, 2009, this board member met with Melvin to obtain personal tax advice, and during this meeting the board member provided confidential information about the transaction, including the approximate time of the deal and information from which the likely acquisition price was apparent. The board member told Melvin that the information discussed during their meeting was confidential. The indictment states that the Georgia State Board of Accountancy prohibits accountants from disclosing confidential information obtained in the course of performing professional services without client consent.

4

According to the indictment, Melvin disclosed material, nonpublic information (referred to in the indictment as "Inside Information") regarding Sanofi's planned acquisition of Chattem to Berry, Cain, Jinks, and another person ("Person A") who worked at Melvin's accounting firm. The indictment alleges that Melvin made this disclosure "for his own personal benefit and in violation of duties of trust and confidence, with the understanding that the Inside Information would be used for the purpose of purchasing or selling securities." [1] at ¶ 4. It alleges that Berry, Cain, Jinks, and Person A, "aided and abetted by" Melvin, "carried out the scheme and artifice to defraud by misappropriating Inside Information of Chattem's, knowing that" Melvin had disclosed it "in violation of duties of trust and confidence" that he owed to his clients, so that Berry, Cain, Jinks, and Person A "could execute and cause the execution of securities transactions on the basis of the Inside Information." *Id.* at ¶ 5. Berry, Cain, Jinks, and Person A "in turn executed and caused to execute transactions in Chattem's securities on the basis of the Inside

Information provided by" Melvin "for their own benefit through personal online brokerage accounts." *Id.* at ¶ 6.

On December 21, 2009, Sanofi publicly announced that it was acquiring Chattem in a $1.9 billion cash deal. Chattem's stock price increased by approximately 33%, rising from $69.98 per share at closing on December 20 to $93.50 per share at closing the next day. According to the indictment, Berry, Cain, Jinks, and Person A "sold their Chattem shares after the merger was publicly announced, thereby earning illegal profits." *Id.* The indictment charges seven counts of securities fraud, corresponding to seven separate transactions in Chattem stock between December 4, 2009 and December 15, 2009. Count one charges Melvin in connection with a purchase of shares on December 10, on behalf of Person A. Count two charges Berry and Melvin in connection with a purchase of shares on December 7. Counts three through six charge Cain and Melvin in connection with purchases of shares on December 4, 7, 11, and 15. Count seven charges Jinks and Melvin in connection with a purchase of shares on December 11.

6

Defendants object to Judge Vineyard's recommendation that the following motions be denied: (1) motions to sever filed by Cain and Berry, (2) motions to strike surplusage filed by Cain, Berry, and Jinks, and (3) motions to dismiss the indictment on various grounds filed by Melvin, Berry, and Jinks.[1] Each category of motions will be addressed separately below in the context of Defendants' objections to the R&Rs. Cain's other pending motions will be addressed in the context of the motions to sever. The Court will also address Berry's motion for reconsideration of the magistrate judge's ruling on his motion for a bill of particulars.

## II. Legal Standard for Review of an R&R

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R&R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404,

---

[1] The magistrate judge also recommended that the Court deny Melvin's motion to suppress evidence. Melvin has not objected to this, and the Court has found no error in the magistrate judge's factual and legal conclusions on that matter.

408 (5th Cir. Unit B 1982)).[2] This review may take different forms,

however, depending on whether there are objections to the R&R. The

district judge must "make a de novo determination of those portions of

the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). In

contrast, those portions of the R&R to which no objection is made need

only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781,

784 (11th Cir. 2006).[3]

"Parties filing objections must specifically identify those findings

objected to. Frivolous, conclusive or general objections need not be

considered by the district court." *Nettles*, 677 F.2d at 410 n.8. "This rule

---

[2] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009) (discussing the continuing validity of *Nettles*).

[3] *Macort* dealt only with the standard of review to be applied to a magistrate's factual findings, but the Supreme Court has held that there is no reason for the district court to apply a different standard to a magistrate's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373-74 (N.D. Ga. 2006) (collecting cases). This is to be contrasted with the standard of review on appeal, which distinguishes between the two. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when a magistrate's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

The district judge also has discretion to decline to consider arguments that were not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009). Indeed, a contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Id.* (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

The Court has conducted a careful, de novo review of the R&Rs and Defendants' objections thereto. Having done so, the Court finds

9

that Judge Vineyard's factual and legal conclusions were correct and
that Defendants' objections have no merit.

## III. Discussion

### A. Motions to Sever

Pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure,
an indictment may charge two or more defendants "if they are alleged to
have participated in the same act or transaction, or in the same series
of acts or transactions, constituting an offense or offenses." The rule
specifies that "defendants may be charged in one or more counts
together or separately. All defendants need not be charged in each
count." FED. R. CRIM. P. 8(b). Courts look to the indictment to determine
whether initial joinder is proper under Rule 8(b). *United States v.
Weaver*, 905 F.2d 1466, 1476 (11th Cir. 1990). "Rule 8 'is broadly
construed in favor of the initial joinder.'" *Id.* (quoting *United States v.
Davis*, 773 F.2d 1180, 1181 (11th Cir. 1985)).

However, even if Rule 8 is satisfied, Rule 14(a) provides that if the
joinder of defendants in an indictment "appears to prejudice a

10

defendant or the government, the court may . . . sever the defendants'

trials, or provide any other relief that justice requires." In this case,

Berry and Cain each seek a separate trial from each other and from

Jinks, contending that they were improperly joined under Rule 8, or

even if they were properly joined, if they are tried with their co-

defendants they will be unfairly prejudiced under Rule 14.

### 1.    Rule 8

In the R&R, Judge Vineyard concluded that "the defendants and

the charged offenses are properly joined [under Rule 8] because they

involve the same series of acts or transactions pursuant to a single

common scheme to illegally profit from the trade of Chattem stock

based on insider information obtained from Melvin." [99] at 10. In doing

so, he presented a thorough analysis of the arguments presented by

Defendants and the case law cited by the parties. However, Berry and

Cain object to Judge Vineyard's decision on several grounds.

First, Cain contends that the R&R does not properly address "the

government's critical admission that the defendants did not aid and

11

abet each other." [103] at 2. Paragraphs one and nine of the indictment indicate that Defendants and Person A, "aided and abetted by each other," executed the alleged scheme to defraud and the specific securities transactions identified in paragraph nine. The Government has clarified that it does not contend that the tippee defendants aided and abetted each other in some way but rather that Melvin aided and abetted each of the tippees. The Government confirmed this in a bill of particulars ordered by the magistrate judge for the purpose of detailing the aiding and abetting allegations in paragraphs one and nine of the indictment. In that bill of particulars, the Government states that "Defendant Melvin aided and abetted each of Defendants Cain, Berry, Jinks, and Person A . . . by misappropriating and disclosing the information regarding Chattem's impending acquisition and disclosing it to each of them with the understanding that the inside information would be used for the purpose of stock trading." [114] at 2. Although the R&R was issued before the bill of particulars, Judge Vineyard explicitly noted that although courts look to the face of the indictment to

12

determine joinder, "for purposes of considering this motion to sever, the Court has accepted the government's representation . . . regarding the scope of the aiding and abetting allegations." [99] at 5 n.6. Although Cain recognizes this statement, he contends that Judge Vineyard did not appreciate the significance of the fact that Berry, Cain and Jinks did not aid and abet each other. Having reviewed the R&R, the Court believes Judge Vineyard did appreciate the significance of this fact and assumed that the tippees did not aid and abet each other.

Contrary to the arguments of Berry and Cain, the Court is not convinced that the indictment must include a conspiracy charge or an allegation that each of the defendants aided and abetted one another in order to satisfy the joinder requirements under Rule 8(b). The Court agrees that such allegations would likely simplify the analysis under Rule 8(b). After all, "[i]t is well established that substantive offenses arising out of a single conspiracy can properly be joined, since the conspiracy provides a common link connecting the offenses." *United*

13

*States v. Kopituk*, 690 F.2d 1289, 1313 (11th Cir. 1982).[4] However, this does not mean that an indictment *must* contain such allegations in order to satisfy Rule 8(b). Indeed, the Eleventh Circuit has expressly indicated that a conspiracy charge is not required for joinder under Rule 8(b). *See United States v. Morales*, 868 F.2d 1562, 1569 (11th Cir. 1989) ("[E]ven if we were to consider the propriety of the joinder under Rule 8(b) in the absence of the conspiracy count against Morales we would still conclude that there was no misjoinder."); *United States v. Butera*, 677 F.2d 1376, 1385 n.7 (11th Cir. 1982) ("The absence of a conspiracy charge in the case before us is of no significance in the Rule 8(b) analysis.").

"The litmus test for misjoined counts under Rule 8(b) is whether the acts described in the indictment are tied by a 'common thread' to

---

[4] While recognizing that the inclusion of a conspiracy charge will often alleviate concerns about misjoinder, the Court recognizes that such a charge does not automatically render joinder proper. *See United States v. Castro*, 829 F.2d 1038, 1045 (11th Cir. 1987) ("Although the existence of a conspiracy often allows joinder when joinder otherwise would be improper, joinder is allowed in such a situation only if the substantive offenses alleged in the indictment fall within the scope of the conspiracy." (citations and internal quotation marks omitted)), *opinion withdrawn in part on denial of reh'g*, 837 F.2d 441 (11th Cir. 1988).

14

each other or the participants." *United States v. McLain*, 823 F.2d 1457, 1467 (11th Cir. 1987).[5] In other words, "in order to establish that the [defendants] have engaged in the 'same series of acts or transactions' under Rule 8(b) the government must demonstrate that the acts alleged are united by some substantial identity of facts and/or participants." *Morales*, 868 F.2d at 1569.[6] Ignoring the "common thread" that ties each of the counts and the Defendants to each other, Cain emphasizes the differences among the charges against him, Berry, and Jinks, noting that each of them "made independent purchases of Chattem stock at different times, in different amounts, from different brokerage houses and different accounts." [103] at 4. He and Berry contend that there is no allegation that they knew that Melvin had allegedly tipped others,

---

[5] In *United States v. Lane*, 474 U.S. 438 (1986), the Supreme Court held that misjoinder is subject to harmless error analysis, overruling *McLain* and other prior cases cited herein to the extent they held or implied that misjoinder was inherently prejudicial. *See United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989).

[6] Cain notes in his objections to the R&R that the standard for joinder of defendants under Rule 8(b) differs from the standard under Rule 8(a), which permits joinder of offenses "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." The Court notes the differing standards and confirms that it is applying the standard under Rule 8(b), the same standard the magistrate judge appears to have applied in the R&R.

had any communications with any other tippee concerning Chattem, or profitted from any of the trades made by the other tippees. Cain therefore contends that he could not have participated in the same series of acts or transactions as Jinks and Berry. But courts have recognized that it is not necessary for each participant to "have been involved in every phase of the venture," nor is it necessary for each participant to "know each of the other participants' roles and identities." *United States v. Wilson*, 894 F.2d 1245, 1253 (11th Cir. 1990).

In their objections, Cain and Berry cite several cases in support of their contentions that the indictment does not satisfy Rule 8(b), but none of those cases is substantially similar to the present case.[7] Citing mostly cases involving multiple conspiracies, Cain and Berry argue that each of the defendants must be aware of each other's actions or know that they are participating in the same transaction or series of

---

[7] Cain and Berry cite a number of cases, many of which have already been distinguished in the R&R. Therefore, the Court will not address every case cited by Defendants, but it will attempt to discuss the cases, or types of cases, they rely more heavily upon.

16

transactions for joinder under Rule 8(b). While a lack of knowledge may be fatal if there is otherwise no substantial connection between the charges, the Court is not aware of any cases explicitly requiring knowledge of the other participants or of the full breadth of the scheme where the acts or transactions are otherwise sufficiently related. *See United States v. Reinhold*, 994 F. Supp. 194, 199-200 (S.D.N.Y. 1998) (determining that separate conspiracies were properly joined in light of a common purpose, noting that "[i]t is the presence of a common plan or scheme, a common aim or goal, not whether each defendant knows of the acts or roles of each other, or of others, that controls"). Cain in particular relies on wheel conspiracy cases,[8] but the Government has not charged Defendants with conspiracy. Thus, variance cases concerning whether the Government offered sufficient proof to convict all defendants of a single conspiracy are distinguishable from the

---

[8] "For a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. . . . If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the 'wheel' is incomplete, and two conspiracies rather than one are charged. *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977) (citations omitted).

17

present case.[9] *See, e.g., Kotteakos v. United States*, 328 U.S. 750, 752 (1946); *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004).

This case is also distinguishable from cases holding that defendants involved in separate, distinct conspiracies were improperly joined because the conspiracies involved different facts, different participants, and at least in one case, different crimes. *See United States v. Castro*, 829 F.2d 1038, 1045 (11th Cir. 1987) ("The only overt acts alleged in the conspiracy count relating to the CD conspiracy were unrelated, in any meaningful way, to the overt acts alleged in the conspiracy count relating to the inventory conspirators. In addition, the crimes committed were of totally different natures and types."), *opinion withdrawn in part on denial of reh'g*, 837 F.2d 441 (11th Cir. 1988); *United States v. Marionneaux*, 514 F.2d 1244, 1248 (5th Cir. 1975)

---

[9] Cain notes that in *United States v. Marcus Schloss & Co.*, 710 F. Supp. 944, 951 (S.D.N.Y. 1989), the court compared the insider trading case before it to a wheel conspiracy, noting that "[w]ith regard to nonpublic information misappropriated by David from Paul, Weiss, David may be regarded as the center of a 'wheel' conspiracy, and his tippees as spokes on the wheel." Although the court in *Marcus Schloss* briefly discussed joinder, the issue in that case was admissibility of evidence. Additionally, whereas here the allegations involve tipping and trading related to a single company, *Marcus Schloss* involved tips concerning several different companies.

(concluding that two separate conspiracies to obstruct justice were improperly joined because they were not in the same series of acts or transactions and had "different participants and completely different overt actions"); *United States v. Giraldo*, 859 F. Supp. 52, 54-55 (E.D.N.Y. 1994) (concluding that two separate conspiracies were improperly joined where there was no allegation that they shared a common plan, they did not temporally overlap, and they were not unified by a substantial identity of participants).

Similarly, the Court recognizes that mere similarity of offenses is insufficient for joinder, but this is not like cases where a common participant serves as the only link between similar but otherwise unrelated offenses.[10] For example, in *United States v. Bova*, 493 F.2d 33 (5th Cir. 1974), co-defendants Bova and Coccuzza were charged in a

---

[10] Cain and Berry cite to a Seventh Circuit opinion noting that Rule 8(b) "does not open the door to mass trials" and "does not, for example, allow all tax evaders whose last names begin with "V" to be tried together, or all tax evaders who have the same zip code, or use the same accountant. *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985). They compare this case to the example of trying all tax evaders who use the same accountant. But Berry, Cain and Jinks did not simply use the same accountant; the indictment alleges that their accountant aided and abetted each of them in executing a single scheme to defraud by trading on the same inside information.

19

four-count indictment with unlawful possession and distribution of heroin. In the first two counts, the defendants were jointly charged with possession and distribution of heroin on August 31, 1972, and in the third and fourth counts Coccuzza alone was charged with possession and distribution of heroin on September 8, 1972. The Fifth Circuit concluded that the first two counts should not have been joined for trial with the third and fourth counts involving Coccuzza alone because "there was no allegation, either in the indictment or, so far as appears from the record, in pretrial proceedings indicating any involvement in or relationship to the September 8th sale of heroin by Bova. There was no 'series' of transactions as to Bova." *Id.* at 37; *see also United States v. Chinchic*, 655 F.2d 547, 551 (4th Cir. 1981) ("At most, the government showed that there were two burglaries involving some of the same defendants."); *United States v. Satterfield*, 548 F.2d 1341, 1345 (9th Cir. 1977) (finding joinder improper where "a nexus between each offense charged in the indictment was absent").[11]

---

[11] Cain also compares this case to *United States v. Lech*, 161 F.R.D. 255, 257 (S.D.N.Y. 1995), where the court held that three separate criminal projects designed

Here, it is not simply that Cain, Berry, and Jinks were charged with a violation of the same statute or that Melvin participated in each of the counts. Cain, Berry, Jinks, and Person A are each alleged to have purchased and sold stock in the same company (Chattem), based on the same inside information that was conveyed to them by the same person (Melvin), on or around the same date, for the same purpose. There is no requirement that all of the allegations against them be identical. If the charges are united by some substantial identity of facts and/or participants, and the Court believes they are, this is sufficient.[12]

Cain and Berry also challenge the magistrate judge's reliance on *United States v. Shoemaker*, No. 2:11-cr-00038-NBB, 2012 WL 256520,

---

to defraud the New York City Board of Education had been improperly joined. However, in that case there was no suggestion that the projects had any relation to each other except for the fact that there was a common participant, and Lech might have had cursory knowledge of the other activities.

[12] The "substantial" identity of facts and participants distinguishes this case from cases like *United States v. Whitehead*, 539 F.2d 1023, 1025 (4th Cir. 1976). In that case, the court held that joinder of two separate sales of cocaine to the same undercover officer was improper where the only other commonalities were the involvement of one of a common participant and the fact that both defendants lived in the same apartment complex. The court noted that Government "did not meet its burden of proving that there was any connection between" the two offenses. *Id.* As explained above, there is a substantial connection among the offenses charged in this case.

21

at *2 (N.D. Miss. Jan. 27, 2012). In *Shoemaker*, the court held that joinder of two separate conspiracies was proper under Rule 8(b) because even though the movant was alleged to have been involved in only one of the schemes and was "not alleged to have been involved in or to have known about" the other scheme, the conspiracies and related underlying charges had "an alleged common objective, to illegally profit from" the same hospital, and the conspiracies were "substantially interrelated by facts" because they involved the same hospital, overlapped in time, had a common participant, and would require proof of common facts. *Id.* at *2-4. Berry contends that because the Government has not identified a specific victim in this case, *Shoemaker* is distinguishable from the present case. However, the indictment alleges that Berry, Cain, Jinks, and Person A each traded in the stock of the same company (Chattem), using the same inside information regarding that company, and each did so with the same purpose of profiting from this information. In the face of these allegations, the Court is not persuaded that the

22

Government was required to identify a specific common victim in the indictment in order to satisfy Rule 8(b).

Finally, Cain argues that the magistrate judge improperly relied on the district court's rulings in a related civil case, *SEC v. Melvin*, No. 1:12-cv-02984-CAP (N.D. Ga. Aug. 28, 2012), to support the finding that the Defendants participated in the same series of transactions. As Cain notes, different rules apply to joinder in the civil and criminal contexts. Rule 20 of the Federal Rules of Civil Procedure permits joinder of defendants when the claims asserted against them arise "out of the same transaction, occurrence, or series of transactions or occurrences." Judge Pannell denied Cain's severance motion in the civil case, finding that while the defendants, including Cain, "are alleged to have committed separate illegal acts as a result of the material nonpublic information from Melvin, the separate acts remain a part of the same series of transactions or occurrences." *SEC v. Melvin*, No. 1:12-cv-02984-CAP (N.D. Ga. Feb. 19, 2014), [96] at 17. Cain argues that reliance on Judge Pannell's finding was improper because criminal

cases raise certain constitutional rights, including the right to a fair trial, that are not at issue in civil cases and because although the two actions involve the same basic allegations, they allege violations of different statutes.

The Court recognizes that Judge Pannell's finding is by no means outcome-determinative in this case. Indeed, even without that finding, the Court would still conclude that Berry and Cain are properly joined under Rule 8(b). However, given that both cases involve the same basic allegations, and the same alleged scheme, Judge Pannell's finding is relevant and supports the Court's conclusion that all Defendants in this case participated in the same series of acts or transactions.

## 2.   **Rule 14**

Cain and Berry also object to the magistrate judge's conclusion that their motion for severance under Rule 14 should be denied. In the context of a Rule 14 motion, the Court must "balance the prejudice that a defendant may suffer from a joint trial against the public's interest in judicial economy and efficiency." *United States v. Schlei*, 122 F.3d 944,

24

984 (11th Cir. 1997) (citations and internal quotation marks omitted). "The burden is on the defendant to 'demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense.'" *Id.* (quoting *United States v. Walker,* 720 F.2d 1527, 1533 (11th Cir. 1983)). The Court agrees with the magistrate judge that Cain and Berry have failed to meet their burden in this case.

Cain contends that if he is tried with Berry and Jinks, the Government will introduce evidence that they also lived in or near Griffin, used Melvin as their accountant, and purchased Chattem stock. Cain argues that this evidence "would be overwhelmingly prejudicial" to him and would not be admissible if Cain were tried alone. Berry also contends that he would be prejudiced by a joint trial with Cain and Jinks because it would unfairly link them and suggest concerted action.

Although Cain and Berry argue that evidence of their co-Defendants' trades would be inadmissible in a separate trial, as the magistrate judge noted in the R&R, other courts have admitted such evidence. *See, e.g.,United States v. Contorinis*, 692 F.3d 136 (2d Cir.

25

2012); *United States v. Ballesteros Gutierrez*, 181 F. Supp. 2d 350 (S.D.N.Y. 2002). As both Berry and the magistrate judge note, *Ballesteros Gutierrez* is distinguishable because it involved trading patterns among family members. However, in *Contorinis*, "the other tippees were strangers to" the defendant. *Contorinis*, 692 F.3d at 144. Berry criticizes reliance on *Contorinis*, noting that the Second Circuit avoided establishing a general rule regarding admissibility of other tippees' trades.

The Court agrees with Berry that the admissibility of such evidence should be determined on a case-by-case basis, weighing the probative value of the evidence against the danger of unfair prejudice in accordance with Rule 403 of the Federal Rules of Evidence. As the magistrate judge recognized, in this case the evidence of trading by other alleged tippees is almost certainly "relevant to establish that defendants executed trades of Chattem stock based on the same source of information as the other tippees, and the parallels between each of their trading, including temporal proximity, is probative of whether

26

defendants, like the other tippees, executed the trades based on Melvin's inside information." [99] 23-24. Further, there is good reason to conclude, as the magistrate judge did, that the probative value will not be substantially outweighed by the danger of unfair prejudice. But even if the trading patterns of other tippees is not admissible against Berry and Cain, this fact alone does not warrant severance. The mere fact that some evidence is admissible against certain defendants and not others does not require severance. *See, e.g., United States v. Repke*, No. 1:10-cr-524-ODE-RGV, 2011 WL 1325610, at *7 (N.D. Ga. Mar. 11, 2011), *adopted*, 2011 WL 1325609 (N.D. Ga. Apr. 6, 2011).

Along the same lines, Berry suggests that a joint trial could result in a "spillover effect." Where "a cumulative and prejudicial 'spill over' effect may prevent the jury from sifting through the evidence to make an individualized termination as to each Defendant," this may constitute a basis for severance. *United States v. Chavez*, 584 F.3d 1354, 1360-61 (11th Cir. 2009). But even if there is a potential for a spillover effect, "a court's cautionary instructions ordinarily will mitigate the

potential 'spillover effect' of evidence of a co-defendant's guilt." *United States v. Lopez*, 649 F.3d 1222, 1235 (11th Cir. 2011) (quoting *United States v. Kennard,* 472 F.3d 851, 859 (11th Cir. 2006)).

The Supreme Court has instructed that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Defendants have not shown such a serious risk in this case. Although separate trials might be more advantageous to Defendants, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540.

### 3. Cain's Supplement to His Motion for Severance

In addition to his objections, Cain has filed a supplement to his motion for severance [137], which the Government opposes. According

28

to Cain, the Government has provided discovery indicating that it intends to introduce evidence regarding additional trades that were made by various individuals connected to one of the Defendants. Cain suggests that this evidence should not be admissible against him and would be highly prejudicial. However, as noted above this evidence is likely admissible against him, and even if it is not, this does not automatically require severance. The Court may use limiting instructions to mitigate any potential prejudice.[13]

Cain also notes that in an interview with the Government, Person A stated that after Melvin conveyed to him information about Chattem, Person A asked Melvin whether he had told anyone else about Chattem, and Melvin stated the names of Berry and Jinks. Cain suggests that because Person A did not mention his name, this statement supports his innocence but prejudices his co-Defendants. In response, the Government states that it has agreed not to offer the substance of

---

[13] Cain asserts that numerous jury instructions would confuse the jury and "greatly increase the length of the trial of this case." [137] at 9. The Court does not see any reason to think that additional jury instructions would lead to significant confusion or delay, and in any event, the time required for separate trials would no doubt greatly exceed the time needed to give additional jury instructions.

Defendant Melvin's statement to Person A about Berry and Jinks due to hearsay issues. In his reply, Cain asserts that his counsel may use Person A's statement on cross-examination, but he does not indicate the theory under which this statement would be admissible or how, in that context, it would prejudice his co-Defendants. At present the Court does not view this as a basis for severance. However, the Court would be willing to revisit this issue at a later date if Cain can provide a better explanation of the circumstances under which this statement might come into evidence.[14]

## B. Motions to Strike Surplusage

Berry, Cain, and Jinks also moved to strike certain paragraphs and counts from the indictment as surplusage. The motions of Berry and Cain appear to be tied to their motions to sever and will therefore be denied based on the denial of the motions to sever.

Jinks, however, has filed objections to the R&R contending that his motion to strike surplusage was not tied to his co-Defendants'

---

[14] Because the Court has denied Cain's motions to sever and has already set the case for trial, the Court will deny Cain's motion for a speedy trial [43] and motion to expedite the trial date [88].

30

motions to sever. In his objections, Jinks notes several portions of the

indictment that he believes should be stricken, including paragraph six,

which states:

> Berry, Cain, Jinks, and Person A, in turn executed and
> caused to execute transactions in Chattem's securities on the
> basis of the Inside Information provided by Defendant
> Melvin for their own benefit through personal online
> brokerage accounts. Defendants Berry, Cain, and Jinks, and
> Person A, sold their Chattem shares after the merger was
> publicly announced, thereby earning illegal profits.

Jinks contends that this paragraph suggests that the tippees jointly

caused the execution of the stock transactions. Jinks also contends that

the Government is not required to prove that the tippees sold the stock

"for their own benefit" or that they thereby earned "illegal profits" and

that this language is inflammatory and/or prejudicial. Jinks further

argues that several other paragraphs are duplicative of other portions

of the indictment and/or are irrelevant, and certain paragraphs do not

pertain to him.

"A motion to strike surplusage from an indictment should not be

granted unless it is clear that the allegations are not relevant to the

charge and are inflammatory and prejudicial.... [T]his is a most exacting standard." *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992) (citations and internal quotation marks omitted). The Court is not satisfied that Jinks has met this standard. It appears to the Court that the allegations in the indictment are relevant to the charges, but even if they are not, Jinks has not demonstrated to the Court how they are inflammatory or prejudicial.

### C. Motions to Dismiss the Indictment

Jinks and Melvin filed motions to dismiss the indictment on the ground that 18 U.S.C. § 1348 is unconstitutionally vague. Jinks and Berry filed separate motions to dismiss the indictment for failure to allege the essential elements of the crimes charged. Melvin also filed several separate motions to dismiss the indictment, or specific counts of the indictment, on various other grounds.[15] The Court will discuss each category of motions to dismiss in turn.

---

[15] The Court notes that Jinks, Melvin, and Berry have also adopted certain of each others' motions.

### 1.   Constitutionality of 18 U.S.C. § 1348

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[T]he vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). In the R&R, the magistrate judge rejected the arguments of Melvin and Jinks that 18 U.S.C. § 1348 is unconstitutionally vague.

Jinks argues that the magistrate judge failed to adequately address the definition of the vague elements of the offense and employed a "backwards" analysis, relying too heavily on the principle that courts rarely find statutes void for vagueness. But the magistrate

33

judge appropriately recognized at the outset that "[t]here is a strong presumption that statutes passed by Congress are valid," *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010), and he did not merely assume that the statute was constitutional. Instead, he went on to analyze the specific language of the statute and the parties' arguments. As explained in the R&R, Defendants have not shown that 18 U.S.C. § 1348 is unconstitutionally vague.

"The first step in a vagueness inquiry is to examine the plain language of the statute." *Wayerski*, 624 F.3d at 1347. "When the plain text of the statute sets forth clearly perceived boundaries," the inquiry is over. *Id.* The statute at issue here, 18 U.S.C. § 1348, provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)); or

34

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d));

shall be fined under this title, or imprisoned not more than 25 years, or both.

As the R&R notes, at least one other court has rejected a similar vagueness challenge to § 1348, noting that "the requisite elements of the statute are straightforward. In order to prove a violation of the 18 U.S.C. 1348, the Government must show: '(1) fraudulent intent (2) a scheme or artifice to defraud; and (3) a nexus with a security.'" *United States v. Motz*, 652 F. Supp. 2d 284, 295 (E.D.N.Y. 2009) (quoting *United States v. Mahaffy*, No. 05-CR-613, 2006 WL 2224518, at *12 (E.D.N.Y. Aug. 2, 2006)). *Motz* recited the standard under 18 U.S.C. § 1348(1), but the elements under §1348(2) are equally straightforward. "[P]ursuant to § 1348(2), the Government can show that [Defendants] executed: (1) a scheme or artifice; (2) to obtain, by means of false or

35

fraudulent pretenses, representations, or promises, any money or property; while possessing (3) fraudulent intent." *United States v. Hatfield*, 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010) (internal quotation marks omitted). There is no evidence that the statute creates a "trap for the unwary" or that it permits "arbitrary enforcement." *Motz*, 652 F. Supp. 2d at 295 (citations and internal quotation marks omitted).

The Court notes that Melvin and Jinks appear to have different views on whether the Court should conduct a general analysis or apply it to the specific facts of this case. Jinks seems to criticize the magistrate judge's application of the statute to this particular case, arguing that this is somehow circular reasoning.[16] In contrast, Melvin criticizes the magistrate judge's reliance on *Motz*, 652 F. Supp. 2d 284, because *Motz* involved a "cherry-picking" scheme rather than an insider trading scheme. The Supreme Court has stated that "[v]agueness challenges to statutes not threatening First Amendment interests are

---

[16] Jinks's primary concern seems to be that an as-applied approach allows the Government to "define and decide what conduct falls within the statute during trial." [135] at 24. That concern seems to align more with the question of whether the indictment sufficiently alleges a crime, which is addressed below.

36

examined in light of the facts of the case at hand; the statute is judged

on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361

(1988). The Court notes that the recent decision of *Johnson v. United

States*, 135 S. Ct. 2551 (2015), which is discussed below, could be read to

call into question this "as-applied" approach. *See Johnson*, 135 S. Ct. at

2560-61 ("[A]lthough statements in some of our opinions could be read

to suggest otherwise, our *holdings* squarely contradict the theory that a

vague provision is constitutional merely because there is some conduct

that clearly falls within the provision's grasp."). However, Jinks has not

explicitly made this argument, and the Court need not address it

because it is convinced that Defendants' challenges to § 1348 would fail

under any standard.

Although Melvin argues that *Motz* is distinguishable because it

involved a scheme of a different nature, the court's reasoning in *Motz*

was not fact-specific. Instead, the court evaluated the statute generally

and noted that Motz did not "articulate why a person of ordinary

intelligence would be unable to understand the conduct prohibited by 18

37

U.S.C. § 1348." *Motz*, 652 F. Supp. 2d at 295. Like Motz, Melvin has

failed to articulate why he or his co-Defendants would not have

understood that their conduct was prohibited by the statute. The only

specific arguments that Melvin appears to make in this regard are that

§ 1348 must not apply to insider trading schemes because a new bill has

been proposed that would specifically ban insider trading, and the

Exchange Act already covers insider trading but has different

requirements.[17] The fact that particular conduct may violate more than

one statute "does not detract from the notice afforded by each" statute.

*United States v. Batchelder*, 442 U.S. 114, 123 (1979). "So long as

overlapping criminal provisions clearly define the conduct prohibited

and the punishment authorized, the notice requirements of the Due

Process Clause are satisfied." *Id.* And indeed, courts have long

recognized that schemes of the sort alleged in the indictment may

violate the mail and wire fraud statutes instead of or in addition to the

Exchange Act. *See Carpenter v. United States*, 484 U.S. 19, 22-25 (1987)

---

[17] The Court addresses below the related argument that the elements of insider trading under § 10(b) of the Exchange Act should be incorporated into § 1348.

(recognizing that where the writer of a Wall Street Journal column on stocks disclosed advance confidential business information to others for purposes of trading, this constituted a "scheme to defraud" within the meaning of the mail and wire fraud statutes).

Melvin also criticizes the magistrate judge's reliance on *United States v. Whitty*, 688 F. Supp. 48, 54-55 (D. Me. 1988), to show that the language "scheme or artifice to defraud" is not vague and has a well-established meaning. Noting that *Whitty* involved bank fraud, he contends that securities fraud cases are more complex than bank fraud cases. But Melvin offers no explanation of how this is the case or why this language might be vague in the context of securities fraud but not in the context of bank fraud.[18]

In addition to his general arguments that § 1348 is vague, Jinks specifically contends that the phrase "in connection with" is void for

---

[18] Regarding enforcement of the statute, Melvin argues that count one of the indictment illustrates that 18 U.S.C. § 1348 permits arbitrary and discriminatory enforcement because Melvin is charged with securities fraud "for legitimately discussing client information with his partner who works with the same accounting firm." [133] at 47. This argument is discussed, and rejected, below in connection with Melvin's motion to dismiss count one.

vagueness because it fails to indicate what degree of connection must be made. Jinks compares this phrase to the residual clause of the Armed Career Criminal Act ("ACCA"), which the Supreme Court recently struck down as being unconstitutionally vague. *See Johnson*, 135 S. Ct. at 2557. The Court does not find this argument persuasive for several reasons.

Under the ACCA, a defendant convicted of being a felon in possession of a firearm faces a harsher sentence if he or she has three or more previous convictions for a "violent felony." The residual clause of that statute defines violent felony to include, in addition to a list of specific felonies, a felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). Jinks seems to compare the phrase "in connection with" under § 1348 to the phrase "otherwise involves" under the ACCA, but the Supreme Court did not focus on the phrase "otherwise involves" as vague in and of itself. Instead, it looked at the clause as a whole. Specifically, the Supreme Court concluded that "[b]y combining

40

indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson*, 135 S. Ct. at 2558. The Court noted that "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime," requiring the Court to imagine an "ordinary instance" of a crime, detached from "real-world facts or statutory elements." *Id.* at 2557.

Unlike the residual clause of the ACCA, § 1348 does not require the Court to apply a qualitative standard to an imagined "ordinary" case. Instead, it looks at whether the specific scheme to defraud at issue is connected with securities. Jinks suggests that there could be varying degrees of connection, which might lead to uncertainty about the statute's reach. But here, the alleged scheme to defraud was clearly connected with the purchase and sale of securities, and Jinks has not offered any examples of a scheme that might be so tangentially related

to securities that a person employing it would not be aware that his or her conduct fell within the statute.

Further, the fact that a statute requires application of a qualitative standard does not automatically render it unconstitutional. In *Johnson*, the Supreme Court acknowledged, "[a]s a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 135 S. Ct. at 2561 (quoting *Nash v. United States,* 229 U.S. 373, 377 (1913)). In other words, the issue with the residual clause was not simply that it contained a qualitative standard but that it required "application of the 'serious potential risk' standard to an idealized ordinary case of the crime.'" *Id.*[19] Jinks has not pointed to an analogous issue here.

---

[19] Also, unlike the residual clause of the ACCA, § 1348 has not been marked by "repeated attempts and repeated failures to craft a principled and objective standard." *Johnson*, 135 S. Ct. at 2558.

## 2.    Failure to Allege a Crime

"An indictment is considered legally sufficient if it: '(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.'" *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) (quoting *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002)). When analyzing the sufficiency of an indictment, courts review the indictment "as a whole and give it a 'common sense construction.'" *Id.* (quoting *United States v. Gold*, 743 F.2d 800, 813 (11th Cir. 1984)). In this case, Defendants raise several alleged deficiencies in the indictment, but their primary argument is that even if § 1348 is constitutional, the Government has failed to allege a crime (or to allege all essential elements of that crime) because it has failed to allege the elements required to prove an insider trading scheme in violation of Section 10(b) of the Exchange Act and

43

Rule 10b-5 promulgated thereunder.[20] The Court disagrees for a number of reasons.

First, Defendants have not offered any authority that expressly indicates the elements required to prove an insider trading violation under § 10(b) and Rule 10b-5 should be imported into § 1348. Jinks admits that § 1348 is a "broader statute" but contends that because insider trading is encompassed within the Exchange Act and because the SEC brought a civil action under § 10(b) and Rule 10b-5 based on the same alleged events, the Government must prove the elements required for a violation of the Exchange Act in this case. The fact that the Government could have brought a criminal action under §10(b) of the Exchange Act does not mean that it was required to, and the fact

---

[20] Jinks also asserts that the Government has failed to allege sufficient facts or elements for aiding and abetting liability under 18 U.S.C. § 2. In doing so, he appears to imply that additional elements or allegations are required to establish liability under this statute. "Title 18 U.S.C. § 2, however, does not establish a separate crime. . . . Rather, it merely permits one who aids and abets the commission of a crime to be punished as a principal." *United States v. Walser*, 3 F.3d 380, 388 (11th Cir. 1993) (citations omitted). In any event, § 2 is discussed in greater detail below.

44

that the SEC brought a civil action for the same conduct is inapposite.[21]
In this action, the Government brought criminal charges under § 1348,
and therefore it must allege the elements of that offense, no more and
no less.

Another judge in this district recently confronted, and rejected, a
similar argument in *United States v. Slawson*, No. 1:14-cr-00186-RWS,
2014 WL 5804191, at \*6 (N.D. Ga. Nov. 7, 2014), *adopted* 2014 WL
6990307 (N.D. Ga. Dec. 10, 2014). In *Slawson*, the Court noted that,
like Defendants here, Slawson "ha[d] not offered a single legal authority
applying [§ 10(b) and Rule 10b-5] case law to the Title 18 security fraud
violations alleged in this indictment," and the Court "decline[d] to
impose on the charges set forth in the indictment the requirement to
plead elements of offenses not charged in the indictment." *Id.* at \*6-7.
*Slawson* is persuasive, especially in light of the fact that "the
overarching purpose of the statute was to broaden the range of conduct
proscribed by existing federal securities laws," *Motz*, 652 F. Supp. 2d at

---

[21] The Court addresses below Melvin's contention that the penalty in the civil
action raises double jeopardy concerns.

294, and "the text and legislative history of 18 U.S.C. § 1348 clearly
establish that it was modeled on the mail and wire fraud statutes," *id.*
at 296, not on the Exchange Act.[22]

But even if the Court were to incorporate the elements required
under § 10(b) and Rule 10b-5 into § 1348, the Court is not convinced
that the indictment would fail. Defendants contend that the indictment
fails to allege the essential elements of insider trading because it does
not allege that the tipper received a personal benefit in exchange for
disclosing the inside information. The Defendants offer a few different
variations of this argument. Jinks argues that it was the Chattem
board member, not Melvin, who was the "tipper," and there is no
allegation that the Chattem board member breached his duty of
confidentiality or received a personal benefit from doing so. But as the

---

[22] The Government has cited several cases indicating that it is not required to prove the elements of 10b-5 when what is essentially an insider trading scheme is charged under the mail or wire fraud statute. *See, e.g., United States v. Bryan,* 58 F.3d 933, 953 (4th Cir. 1995) ("Those who trade on purloined information but who do not come within the *Chiarella/Dirks* definition of 'insider' are still almost certain to be subject to criminal liability for federal mail or wire fraud."), *abrogated on other grounds by United States v. O'Hagan,* 521 U.S. 642 (1997).

46

Government has noted, even under the Exchange Act, the "misappropriation theory" recognizes that a person may be liable for misappropriation of inside information even if that person was not a corporate insider with duties of confidentiality to the corporation. *See United States v. O'Hagan*, 521 U.S. 642, 650 (1997) (holding that "criminal liability under § 10(b) may be predicated on the misappropriation theory").[23] The Eleventh Circuit has indicated that under § 10(b), "there is no reason to distinguish between a tippee who receives confidential information from an insider (under the classical theory) and a tippee who receives such information from an outsider (under the misappropriation theory)." *SEC v. Yun*, 327 F.3d 1263, 1276 (11th Cir. 2003).

Defendants also contend that there is no allegation that Melvin received the type of personal benefit required for liability under the Exchange Act. The indictment alleges that Melvin misappropriated

---

[23] "The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b–5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 52.

47

inside information and disclosed it "for his own personal benefit and in violation of duties of trust and confidence, with the understanding that [the information] would be used for the purpose of purchasing or selling securities." [1] at ¶ 4. It also alleges that Defendants "carried out the scheme and artifice to defraud by misappropriating" the inside information "knowing that" Melvin had disclosed it "in violation of duties of trust and confidence" owed to his clients so that Berry, Cain, Jinks, and Person A "could execute and cause the execution of securities transactions on the basis of the Inside Information." *Id.* at ¶ 5. Defendants rely heavily on a recent Second Circuit case, *United States v. Newman*, 773 F.3d 438, 448 (2d Cir. 2014), which appears to take a relatively narrow view of what constitutes a personal benefit, but *Newman* is not binding authority. While acknowledging that to prove a violation of § 10(b), the SEC must establish that a tipper intended to benefit from disclosure, the Eleventh Circuit has interpreted *Dirks v. SEC*, 463 U.S. 646 (1983), to define "'benefit' in very expansive terms," indicating that in *Dirks*, "[t]he Court declared that not only does an

48

actual pecuniary gain, such as a kickback or an expectation of a reciprocal tip in the future, suffice to create a 'benefit,' but also cases where the tipper sought to enhance his reputation (which would translate into future earnings) or to make a gift to a trading relative or friend." *Yun*, 327 F.3d at 1280.

In addition to their arguments regarding personal benefit, Defendants assert that they do not have a clear understanding of what they have been charged with or what conduct allegedly constitutes the scheme to defraud, but the Court is not persuaded by this argument. The Eleventh Circuit has stated that "[a]n indictment that tracks the language of the relevant statute is sufficient, as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused." *Jordan*, 582 F.3d at 1246 (quoting *United States v. Walker,* 490 F.3d 1282, 1296 (11th Cir. 2007)). The Court agrees with the magistrate judge that the indictment in this case meets this standard and gives Defendants "notice sufficient to enable them to prepare a defense." *Id.*

Defendants also appear to raise various defenses to the charges against them and to question whether the Government has sufficient evidence to prove these charges, but the Court may not consider such things in reviewing a motion to dismiss the indictment. "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006). "There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992).[24]

---

[24] In his objections, Jinks renews his request that the Government be directed to proffer evidence concerning his knowledge of the insider receipt of a personal benefit and that the Government be directed to produce grand jury minutes. But Jinks has not shown proper grounds for these requests. *See United States v. Aisenberg*, 358 F.3d 1327, 1348 (11th Cir. 2004) ("[T]he party seeking disclosure of grand jury material must show a compelling and particularized need for disclosure.")

### 3. Melvin's Separate Motions to Dismiss

#### a. Double Jeopardy

Melvin has also moved to dismiss the indictment on the grounds of double jeopardy, based on civil proceedings arising out of the same conduct. Melvin states that as a result of those proceedings, he was held jointly and severally liable with Cain and Jinks for interest and disgorgement of the profits they gained as a result of their transactions in Chattem stock. A civil penalty in the amount of $108,930.05 was also imposed on him, and he was permanently disqualified from practicing accounting before the SEC. Melvin argues that together, these sanctions "constitute excessive, punitive, and criminal punishment for the alleged insider trading at issue in the instant indictment." [133] at 3. Therefore, according to Melvin, prosecution of this case would be contrary to the Double Jeopardy Clause of the Fifth Amendment.

"The Double Jeopardy Clause provides that no person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." *Hudson v. United States*, 522 U.S. 93, 98 (1997) (internal quotation

51

marks omitted). It "does not prohibit the imposition of all additional sanctions that could . . . be described as punishment." *Id.* at 98-99. Rather, it "protects only against the imposition of multiple *criminal* punishments for the same offense." *Id.* at 99. In determining whether a punishment is criminal or civil, the Court must first ask whether the legislature has indicated an intention for the punishment to be one or the other, but even where the legislature indicates an intent to establish a civil penalty, the Court also looks at "whether the statutory scheme was so punitive either in purpose or effect . . . as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Id.* (internal quotation marks omitted).

In the R&R, the magistrate judge noted that other circuits have found that disgorgement of profits and penalties under the Exchange Act were intended by Congress to be civil and are not "so punitive in purpose or effect as to override Congress's intent to provide for civil penalties." [118] at 34 (quoting *SEC v. Palmisano*, 135 F.3d 860, 865-66 (2d Cir. 1998)). Melvin does not disagree that Congress intended the

penalties imposed on him to be civil, but he argues that they are so punitive in effect as to constitute a criminal penalty.

Melvin contends that the magistrate judge overlooked the rule that unjust enrichment serves as the requisite basis for disgorgement. He argues that in the cases relied upon by the magistrate judge, the defendant had actually received ill-gotten gains, but in his case there was no legal basis for disgorgement because he never traded stocks or obtained any "ill-gotten gains" from his co-Defendants based on their trades. Based on this and other reasons, Melvin essentially contends that the disgorgement amounts are excessive in his case. There are several problems with this argument.

First, the Eleventh Circuit has indicated that courts should examine the statutory scheme on its face, rather than analyzing the specific penalty at issue. *See Grossfeld v. Commodity Futures Trading Comm'n*, 137 F.3d 1300, 1303 n.7 (11th Cir. 1998) ("Grossfeld argues that the $1.8 million fine imposed by the Commission is excessive because it is out of line with other Commission fines and it is unrelated

to the government's losses. However, *Hudson* makes it clear that we are to examine the statute on its face.").[25] Additionally, as the Government has noted, Melvin did not contest the amount or imposition of disgorgement in the civil proceeding; in fact he consented to it. And ultimately, even if the Court analyzed the specific penalty imposed here, the Court is not convinced that either the amount or the circumstances of the disgorgement in this case transform it into a criminal penalty.

Melvin also contends that the magistrate judge overlooked five of the seven factors that courts apply to determine whether a penalty is effectively criminal. The Supreme Court has identified the following seven factors as "useful guideposts" in determining whether a penalty is criminal: "(1) [w]hether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a

---

[25] Indeed, as the Supreme Court indicated in *Hudson*, 522 U.S. at 103, "The Due Process and Equal Protection Clauses already protect individuals from sanctions which are downright irrational," and "[t]he Eighth Amendment protects against excessive civil fines, including forfeitures." Melvin's arguments regarding the unreasonable or excessive nature of the disgorgement seem more properly to fall within the realm of these provisions rather than the Double Jeopardy Clause.

punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned." *Hudson*, 522 U.S. at 99-100 (citations and internal quotation marks omitted). However, the Court has noted that "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 100 (quoting *United States v. Ward*, 448 U.S. 242, 249 (1980)).

The Court agrees with the magistrate judge that Melvin has not shown the "clearest proof" needed to transform the sanctions in his civil case into a criminal penalty. Indeed, the analysis here is similar in many respects to the analysis in *Hudson*. As the Supreme Court noted, "neither money penalties nor debarment has historically been viewed as punishment." *Hudson*, 522 U.S. at 104. And although Melvin has been

prohibited from practicing accounting before the SEC, the sanctions imposed on him "do not involve an 'affirmative disability or restraint,' as that term is normally understood." *Id.*

Melvin notes that, as evidenced by this case, the conduct for which sanctions were imposed may also be criminal, but this "is insufficient to render the money penalties and debarment sanctions criminally punitive." *Id.* at 105. Likewise, the fact that the sanctions may serve a deterrent purpose does not necessarily render them criminal, "as deterrence may serve civil as well as criminal goals." *Id.* (citations and internal quotation marks omitted). Just as the sanctions at issue in *Hudson* "serve[d] to promote the stability of the banking industry," *id.*, so the sanctions imposed on Melvin serve "other important nonpunitive goals, such as encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry." *Palmisano*, 135 F.3d at 866. And although the penalties here did involve scienter, "[t]he linkage of the size of the potential fine to the level of the violator's scienter, the risk of loss to others, and the amount

56

of the defendant's unlawful profits minimizes the possibility that a fine will be excessive in relation to Congress's nonpunitive goals." *Id.*

### b. Aiding and Abetting Charges

Melvin also contends that counts one through seven should be dismissed as to him because the Government failed to charge him with the requisite intent to support the aiding and abetting theory. Pursuant to 18 U.S.C. § 2(a), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." "[A] person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1248 (2014). "[F]or purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Id.* at 1249. Melvin contends that the indictment fails to charge him with the specific intent to commit securities fraud, or the specific intent to conduct the securities transactions.

57

In his initial motion, Melvin focused on the indictment, and in his objections he focuses on the Government's bill of particulars, indicating that Melvin aided and abetted his co-Defendants and Person A "by misappropriating and disclosing the information regarding Chattem's impending acquisition and disclosing it to each of them with the *understanding* that the inside information would be used for the purpose of stock trading." [114] at 2 (emphasis added). Melvin argues that the word "understanding" is not sufficient to allege the requisite intent. But allegations are not jury instructions, and "[l]inguistic precision is not required in an indictment." *United States v. DeVegter*, 198 F.3d 1324, 1330 (11th Cir. 1999). Reviewing the indictment as a whole and giving it a common sense construction, the Court concludes that at the very least, the indictment implicitly alleges the requisite intent for aiding and abetting.

The bill of particulars does not just allege that Melvin disclosed the inside information with the understanding that the tippees might use it for trading. It alleges that Melvin misappropriated the

information (indicating a breach of duty) and that he disclosed the information with the understanding that it *would* be used for the purpose of stock trading. This is consistent with other language in the indictment. The indictment alleges that Melvin "disclosed the Inside Information" to his co-Defendants and Person A "for his own personal benefit and in violation of duties of trust and confidence, with the understanding that the Inside Information would be used for the purpose of purchasing or selling securities." [1] at ¶ 4. And it alleges that Berry, Cain, Jinks and Person A carried out the scheme and artifice to defraud by misappropriating that information "knowing that" Melvin had disclosed it in violation of duties of trust and confidence to his clients "so that" Berry, Cain, Jinks and Person A "could execute and cause the execution of securities transactions on the basis of the Inside Information." *Id.* at ¶ 5.[26]

---

[26] Additionally, the indictment specifically alleges that the Defendants "knowingly and willfully" executed the scheme. Melvin suggests that this language is somehow erased from the bill of particulars, but the bill of particulars concerned the nature of the alleged aiding and abetting (i.e., who aided and abetted whom and in what way), not the intent to commit the crime.

### c.    Count One

Melvin also contends that count one of the indictment should be dismissed because he had a right to disclose inside information to Person A, who was a partner in his firm, and to assume that Person A would maintain the confidentiality of this information. Melvin argues that because he could have lawfully disclosed the information to Person A, the Government must allege sufficient facts to negate lawfulness. But as the magistrate judge noted, there is no statutory exception in § 1348.

More to the point, the indictment does negate lawful disclosure. It specifically alleges that Melvin "misappropriated" the inside information in violation of the duties of trust and confidence owed to his client and that he disclosed this information to Person A "for his own personal benefit and in violation of duties of trust and confidence, with the understanding that the Inside Information would be used for the purpose of purchasing or selling securities." [1] at ¶¶ 3-4. These allegations foreclose the possibility that Melvin properly disclosed the

inside information to Person A with the reasonable belief that "Person A would keep the information in confidence and would not trade on it." [133] at 31.[27] Of course, the Government must prove its allegations at trial, and Melvin is free to argue at trial that the information was disclosed to Person A for legitimate reasons. But for purposes of the motion to dismiss, the Court looks only to the indictment.

### d. Collateral Estoppel

Melvin also contends that the magistrate judge erred by denying his motion to dismiss the indictment based on collateral estoppel. For collateral estoppel to apply, the party relying on it must show:

> (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

---

[27] Melvin argues that the Government must allege specific facts to establish the basis for his alleged understanding that Person A would use the information for trading, but he cites no case law in support of this. *See Sharpe*, 438 F.3d at 1263 n.3 (11th Cir. 2006) ("It is not necessary for an indictment ... to allege in detail the factual proof that will be relied upon to support the charges." (citation and internal quotation marks omitted).

*Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000) (quoting

*Pleming v. Universal–Rundle Corp.,* 142 F.3d 1354, 1359 (11th Cir.

1998)). Melvin argues that in the SEC administrative proceeding

against him, the administrative law judge ("ALJ") "made an

unambiguous factual finding that there is no evidence that Melvin

received, or made arrangements to receive, any financial or material

benefit from his disclosures," [133] at 33 (citations and internal

quotation marks omitted), and that therefore the Government cannot

re-litigate that issue here.

The Court agrees with the magistrate judge that Melvin has not

shown that the issue he seeks to have precluded was actually litigated

in the administrative proceeding or that it was a critical and necessary

part of the administrative judgment. Melvin notes that "[w]hen an issue

is properly raised, by the pleadings or otherwise, and is submitted for

determination, and is determined, the issue is actually litigated."

*Christo*, 223 F.3d at 1339 (quoting *Pleming*, 142 F.3d at 1359). He

points to a number of filings in the administrative proceedings that he

believes demonstrate that the parties in the administrative proceeding litigated "the critical issues of whether Melvin benefited from his alleged misconduct and, as a result, whether it is appropriate to impose permanent disqualification upon him." [133] at 35. Even assuming that these filings indicate that the foregoing issues were raised, they do not show that the issues were submitted for determination or actually determined. As noted in the R&R, Melvin reached a settlement with the SEC in his civil action, and the only issue addressed by the ALJ's order was whether the parties had agreed to a maximum three-year ban on his ability to practice before the SEC and whether the appropriate sanction as a permanent ban. Although the ALJ made the above statement, there is no indication that the parties raised this as a contested issue or otherwise submitted it for determination.

Additionally, Melvin has failed to explain how the ALJ's determination was a critical and necessary part of the decision when the ALJ ruled against him, concluding that Melvin should be permanently disqualified from practicing before the SEC. Melvin argues

that because the ALJ was required to determine the "egregiousness" of his actions, the ALJ necessarily had to determine the nature of the personal benefit to Melvin. The Court is not persuaded that the ALJ was necessarily required to determine the specific nature of the benefit to Melvin, but even if Melvin were correct, the ALJ—as Melvin acknowledges— also concluded that it "appears that the disclosure of the material non-public information allowed Melvin to further his personal and/or professional relationship [with the tippees]." [133-3] at 8. Melvin attempts to distinguish the phrase "it appears" from the phrase "there is no evidence," but the Court is not convinced. As the magistrate judge noted, despite the statement that there was no evidence that Melvin received a financial or material benefit from his disclosure, the ALJ "appears to have nonetheless found a personal benefit sufficient to impose a remedial sanction in the form of a permanent disqualification from practice before the Commission." [118]

at 60 n.30. In short, the Court is not convinced that the ALJ's finding was essential to the resolution.[28]

### e.    Multiplicitous and Fatally Defective

The magistrate judge concluded that the indictment is not multiplicitous for the reasons stated in the Government's response to his motions. Melvin takes issue with this conclusion.

"An indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008) (citing *Ward v. United States,* 694 F.2d 654, 660-61 (11th Cir. 1983). To determine whether an indictment is multiplicitous, the Court must "first determine the allowable unit of prosecution." *United States v. Smith*, 231 F.3d 800, 815 (11th Cir. 2000) (quoting *United States v. Langford,* 946 F.2d 798, 802 (11th Cir. 1991)).

The Court agrees with the Government that § 1348 criminalizes the *execution* of a scheme to defraud. This is consistent, for example,

---

[28] The Court also notes that even if it had concluded that collateral estoppel applies, it is not clear that this would require dismissal of the indictment, particularly in light of the discussion above regarding the essential elements of the charges.

with the Eleventh Circuit's interpretation of the bank fraud statute. *See United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001) (concluding that "[t]he unit of the offense created by § 1344 is each execution or attempted execution of the scheme to defraud, not each act in furtherance thereof"). As the court recognized in *De La Mata*, "a single scheme can be executed a number of times, and a defendant may be charged in separate counts for each 'execution' of the scheme to defraud." *Id.* Here, each securities transaction was an execution of the scheme to defraud, thereby constituting a separate offense. *See United States v. Hatfield*, No. 06-CR-0550 (JS), 2009 WL 2182593, at *2 (E.D.N.Y. July 22, 2009) (noting that "each transaction in a securities fraud case constitutes a separate offense" (citations and internal quotation marks omitted)).[29]

---

[29] Melvin relies on *United States v. Gagalis*, No. 04-CR-126-0106-PB, 2006 WL 931909 (D.N.H. Apr. 7, 2006), to question the use of separate securities transactions as the unit of prosecution, but his reliance on *Gagalis* is misplaced. *Gagalis* involved criminal charges under the Exchange Act arising out of false and misleading statements in a press release and Form 10-Q. *Id.* at * 1.

Melvin does not contest the foregoing application to the charges against his co-Defendants, but he appears to argue that because he himself did not execute the securities transactions at issue, the unit of prosecution for him must be based on some other conduct (i.e., his disclosure of the inside information). However, Melvin does not cite any persuasive authority to support this argument, and as the Government pointed out in its opposition, this reasoning ignores the fact that Melvin is charged with aiding and abetting Person A and his co-Defendants under 18 U.S.C. § 2. In other words, Melvin may be liable for aiding and abetting even if he did not directly execute the stock trades himself. *See United States v. Hassoun*, 476 F.3d 1181, 1184 n.2 (11th Cir. 2007) (noting that the inclusion of 18 U.S.C. § 2 in the indictment was not material to the analysis of whether the indictment was multiplicitous because § 2 "simply codifies an alternate theory of liability"). Further, as noted in the R&R, even if the indictment were multiplicitous, this would not necessarily require dismissal. *See* [118] at 40.

Likewise, the Court is not convinced by Melvin's argument that counts one through seven are fatally defective because they fail to allege that he committed an act that would constitute the execution of the scheme to defraud. *See United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007) ("[A] defendant may be convicted of mail fraud without personally committing each and every element of mail fraud, so long as the defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme.").

## D.  Motion for Reconsideration Regarding Bill of Particulars

Berry has moved for reconsideration of the magistrate judge's ruling partially denying his motion for a bill of particulars. Pursuant to 28 U.S.C. § 636(b)(1)(A), the Court may reconsider a decision regarding such a pretrial matter "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." Here, the Court

does not believe the magistrate judge's partial denial of Berry's motion for a bill of particulars was clearly erroneous or contrary to law.[30]

Berry contends that he is entitled to a bill of particulars specifying who was defrauded by the alleged scheme to defraud, who made the alleged false or fraudulent pretenses, representations, or promises, and what benefit Melvin allegedly received by providing the inside information to Berry. He insists that this information goes to the heart of the case and is necessary to prepare a defense of the case.

But Berry has not shown how the additional information he seeks is necessary "to allow him to prepare his defense, to minimize surprise at trial, [or] to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Warren*, 772 F.2d 827, 837 (11th Cir. 1985). For example, Berry cites to no requirement that the Government identify or prove a particular victim,

---

[30] Jinks also filed "objections" to the magistrate judge's order on his motion for a bill of particulars [107]. In those objections, he requests that the magistrate judge amend his order or that the district court review that order. But like Berry, Jinks has failed to show that the magistrate judge's decision was clearly erroneous or contrary to law. Therefore, to the extent Jinks asks the Court to reconsider that ruling, his request is denied.

and he does not explain how this is necessary for his preparation of a defense. *See United States v. Mahaffy*, No. 05-CR-613, 2006 WL 2224518, at \*12 (E.D.N.Y. Aug. 2, 2006) (noting that § 1348 does not define a "narrow range of prospective victims," and "it is sufficient that the Indictment alleges the defendants intended to defraud *'any* person *in connection* with any security'" (quoting 18 U .S.C. § 1348(1)). Further, the Court believes the indictment contains sufficient details regarding the nature of the alleged scheme to defraud, and the "false or fraudulent pretenses, representations, or promises" employed, as well as the nature of the relationship between Melvin and Berry. In short, the Court agrees with the magistrate judge that Berry's requests are either already covered by the allegations contained in the indictment and the information provided in discovery, or they are beyond the proper scope of a bill of particulars. Therefore, Berry's motion for reconsideration will be denied.

70

## IV.   Conclusion

For the foregoing reasons, the Court hereby adopts as its order the

R&Rs [99 & 118] and denies Defendants' motions to sever [40 & 53],

motions to strike surplusage [42, 54 & 56-1], motions to dismiss the

indictment [46, 48, 51, 57, 71, 75, 80, 82 & 86], and motion to suppress

evidence [84]. The Court also denies Berry's motion for reconsideration

of the ruling on his motion for a bill of particulars [104] and Cain's

motion for a speedy trial [43], motion to expedite the trial date [88], and

supplemental motion to sever [137].

IT IS SO ORDERED this 10th day of November, 2015.

Timothy C. Batten, Sr.
United States District Judge